The TRAVELERS INSURANCE COM-
PANY, Appellant,

v.

Carolina GARCIA, Appellee.

No. 5888.

Court of Civil Appeals of Texas.

El Paso.

May 31, 1967.

Rehearing Denied July 26, 1967.

Kemp, Smit, White, Duncan & Ham-
mond, William Duncan, El Paso, for ap-
pellant.

Malcolm McGregor, Gus Rallis, El Paso,
for appellee.

OPINION

CLAYTON, Justice.

This is an appeal from a judgment in
the District Court of El Paso County,
Texas in a Workmen's Compensation case.

Plaintiff, appellee here, filed suit in an
appeal from the award of the Industrial
Accident Board. She testified that she

had entered into a common-law marriage which ended with the death of her husband in 1958. She related she had worked for Safeway food stores continuously from 1953 through January of 1961. On January 6, 1961 there was an armed robbery in her store in which she, as a checker, was one of the victims. She was "scared to death", thought she could see her little boys' faces, thought she was going to die, could never forget the robber's eyes and afterwards was very nervous and depressed, would have nightmares and "knew she was sick because I had never felt like that." Her doctor prescribed tranquilizers which she had taken since then "on and off". She thought she would become a dope addict, so she started buying whiskey and took "some shots at night". She stated she had never done that before.

Plaintiff had a gall bladder operation in October of 1961, but this didn't relieve her nervousness, so her doctor sent her to Dr. Bennett, a psychiatrist, because she was very depressed. Dr. Bennett diagnosed her condition as follows:

"A.   Well, she had an intense depression and a good deal of anxiety. She was very suspicious and apprehensive of people. Her attitude bordered almost on psychosis.

Q     Doctor, if the evidence had showed prior to January 6, 1961, this was a very happy outgoing person who got along extremely well with her fellow employees and customers, would you characterize what you observed there as a personality change?

A     Yes, definitely.

Q     Doctor, is this what is sometimes called 'a neurosis?

A     Yes, at the time I saw her I would classify it as a neurosis. Some of the ideas that she entertained—she was extremely anxious and extremely suspicious and one wondered if some of her suspicions weren't bordering on delusions.

Q     When you say 'delusions', does that distinguish a neurosis from a psychosis?

A     Yes, there is a break in reality there. They can't recognize reality from fantasy."

She saw this doctor from December, 1961 until January of 1962, and then went back to work, taking the tranquilizers, and worked until July 28th of 1964, when she "walked out on the job." Meanwhile, she had engaged in a fight with a waitress and was cut in the face. Then, just before she left her job, she claimed that the manager of her Safeway store had exposed himself to her in a wash room of the store and she "told him off" and "got out of there mad at him". She claimed none of the occurrences had happened to her before the holdup. She went back to Dr. Bennett in August of 1964 because her family told her she "was sick and that I had been sick and that I needed medical attention". The doctor at that time described her condition as: "she was much more paranoid at that time, more than the first time even", for which he hospitalized her in October, 1964 for shock therapy, where she remained for five weeks. She suffered a swelling of her features, but improved from treatment. In answer to a hypothetical question from her counsel, the doctor testified that the holdup in January, 1961, within reasonable medical certainty, precipitated her intense emotional reaction and that she was then, in May, 1966, suffering from a neurotic condition, some of which was permanent. The doctor was not cross-examined by defendant's attorney. The doctor further testified:

"Q     She was an ill person, Doctor?

A     Sick.

Q     Did you recommend at that time hospitalization for her?

A     Yes, I did.

Q Let me ask you this: Did she realize and appreciate her illness?

A No, I don't think so and I don't think she was too certain about me. I think she was a little suspicious of me at the time.

Q All right, Doctor, when did you next see her?

A The next time I saw her was in 1964—August 18, 1964.

Q And what was her condition at that time?

A I think it was worse than when I first saw her.

Q Could you describe it to the jury?

A She was still extremely anxious, she was very depressed. She came in and told me 'I think too hard. Everybody lies. I lost my job at Safeway'. People didn't understand her and they were trying to do things. They criticized her and belittled her. She was much more paranoid at that time, more than the first time, even."

A witness testified that plaintiff was referred to Vocational Rehabilitation in December of 1964. She was placed in a job training position for six months but only lasted two days. The witness was unable to place plaintiff with a regular employer but plaintiff was taking bookkeeping courses in evening school a month before the trial in May, 1966.

■ The case was submitted to the jury on special issues. We will discuss principally those attacked on points of error. In Special Issue No. 1 the court, with appropriate definitions, inquired if plaintiff sustained an injury on or about January 6, 1961. The jury answered affirmatively to this issue and to Special Issue No. 2, that plaintiff had sustained some total incapacity following such injury. Then, in answer to Special Issue No. 3, the jury found that the injury inquired about was a producing cause of the total incapacity. This answer is assailed in Point of Error No. 1 on the grounds of "no evidence", and as being so contrary to the weight and preponderance of the evidence as to be manifestly unjust, and that the court erred in overruling defendant's objection to the submission of such special issue that "There is no evidence that the 'injury' was a producing cause of any total disability." On the basis of the uncontroverted testimony of the psychiatrist, Dr. Bennett, we overrule these points of error Nos. 1, 2 and 3.

■ Special Issue No. 14 inquired whether the plaintiff thought that the accidental injury upon which the suit was based (the holdup of January 6, 1961) was a trivial injury. The jury answered in the affirmative. Point of Error No. 4 asserted "no evidence" and No. 5 asserted "contrary to the weight of the evidence" to support this answer of the jury, and No. 6, that the court erred in overruling defendant's objection to the submission of this issue, that there was no evidence that plaintiff thought her condition, as related to the incident of January 6, 1961 was trivial at any time, or at such time as would account for her having this belief up to and including the date of the filing of the claim. At this point it should be stated that the parties hereto stipulated to the court in the absence of the jury, that plaintiff's claim for compensation under Texas' Compensation Act was filed with the Industrial Accident Board on April 2, 1962, such claim was passed on by the Board on August 6, 1965 and notice of appeal from this ruling and suit filed by plaintiff on August 20, 1965. Special Issue No. 15 inquired whether the belief of plaintiff mentioned in Special Issue No. 14 constituted "good cause" as defined in Issue No. 15, for plaintiff's failure to file her claim with the Industrial Accident Board up until the time that the same was filed, to which the jury answered "Yes".

Appellant takes the position that the jury never was told when the plaintiff's claim was filed and therefore had nothing upon which to base this affirmative answer. We are cited to Texas Employer's Ins. Ass'n v. Roberts, 135 Tex. 123, 139 S.W.2d 80 (adopted opinion; 1940) as authority for holding that in the event of such a belief, "good cause" exists only while such belief continues, and Jones v. Texas Employers Ins. Ass'n, 128 Tex. 437, 99 S.W.2d 903 (1937) that the proof must show "good cause" for the full period of the delay. However, reviewing the psychiatrist's testimony as set out above, as well as other testimony in the record, we find plaintiff to have been suffering from a mental ailment bordering on psychosis during the period of her examination from December, 1961 into January, 1962, which condition was found to be worse in 1964, when she was hospitalized. Under such circumstances, the behavior of plaintiff cannot be judged by the usual standards set for the behavior of a reasonably prudent person. We believe the record in this case to be sufficient to meet the requirements set out in the Roberts case and the Jones case cited to us.

Special Issue No. 18 inquired whether plaintiff was suffering from a mental condition prior to April 2, 1962, to which the jury answered "Yes", and further, under Special Issue No. 19, that such condition constituted good cause for the plaintiff's failure to file her claim until the time it was filed. The appellant attacks these findings in Points 16, 17, 18, 19, 20 and 21, as follows: Points 16 and 19, "no evidence" for the answers to Issues Nos. 18 and 19; Points 17 and 20, "contrary to the weight of the evidence" for said answers; Points 18 and 21, error on the part of the court in overruling appellant's objections to Issues Nos. 18 and 19, reading as follows:

"There is no evidence that Plaintiff (Appellee) labored under any mental condition that would affect her capacity to file a claim with the Industrial Accident Board or handle business related to the same, the testimony being entirely silent on the subject of her capacity or incapacity at the time in question, namely, between the date of the accident or incident and the date of the filing of the claim. There is no evidence that she was incapacitated in such a way by reason of a mental condition that she could not have filed the claim in due time."

"The question as submitted will be misleading and confusing to the jury for the reason there is no definition of a mental condition that would be an excuse for late filing and the jury will be at liberty to speculate as to whether it means a condition that would incapacitate one from taking care of business or merely a mental condition that would amount to some nervousness or emotional state, the latter not being incapacity that would justify a late filing. There is no testimony of the former."

Based upon this record, we overrule Points of Error Nos. 16, 17, 18, 19, 20 and 21. In view of this ruling, the jury's answers to Special Issues Nos. 14 and 15 with regard to "trivial injury", set out in Points of Error Nos. 4, 5 and 6, and Points 7, 8 and 9, relative to "good cause" because of her belief, may be ignored or treated as surplusage in the verdict. The same may be said of the affirmative answers to Special Issues Nos. 16 and 17, that plaintiff thought that her injuries were the result of a gall bladder condition, and that this constituted "good cause" for the late filing of her claim, similarly attacked in Points of Error Nos. 10, 11, 12, 13, 14 and 15, which Points of Error are likewise overruled.

Having touched on all points of error and finding none under the record in this case, the judgment of the trial court is affirmed. This opinion shall be taken to affirm the judgment as reformed to exclude recovery of $610.00 medical expenses owing to Dr. Bennett as there is

no showing or finding that appellant "refused, failed or neglected to furnish appellee medical care". Liberty Universal Insurance Company v. Gill, 401 S.W.2d 339, 346 (Tex.Civ.App., 1966; ref., n.r.e.):

> "We sustain appellant's seventh, eighth, ninth, tenth and eleventh points of error which relate to alleged error in submitting Special Issue No. 10 inquiring as to the amount of the unpaid bill of Dr. Martin A. Zionts, and in entering judgment for $95.00 on the jury's answer thereto, since there is no evidence or finding by the jury that appellant refused, failed or neglected to furnish appellee medical care or treatment. * * Such testimony did not constitute any evidence more than a scintilla that appellant refused, failed or neglected to furnish medical treatment. It certainly did not establish such fact as a matter of law. Appellee failed to obtain a jury finding which would entitle him to recover under the provisions of Article 8306, Sec. 7, V.A.T.S."

Affirmed.

## ON MOTION FOR REHEARING

Rehearing Denied.

## DISSENTING OPINION

PRESLAR, Justice (dissenting).

I respectfully dissent and would grant a rehearing and reverse, and in the interest of justice, remand this case on the issue of good cause for failure to file the plaintiff's claim within the statutory six-month period. As indicated in the majority opinion, the date on which the claim was filed was stipulated by the parties outside the presence of the jury. The jurors never knew that date, yet were called upon to determine if good cause existed for failure to file up until such date. The period of time in which claims must be filed is no mere technicality, but is the public policy of the State as declared by legislative en-

actment. It is the established law that good cause for failure to file a claim must be shown to exist up to the time of filing. The existence of good cause up until the claim was filed was a controverted ultimate fact issue. The date of actual filing not being in evidence, the jury could not make a determination of that issue. This was a vital and necessary issue, and I see no way to avoid the deficiency in the evidence—oversight though it may be. It is, however, such a situation as requires another trial rather than rendition, in my opinion.