GTE SOUTHWEST, INCORPORATED,
Petitioner,

v.

Rhonda BRUCE, Linda Davis, and
Joyce Poelstra, Respondents.

No. 98–0028.

Supreme Court of Texas.

Argued Sept. 10, 1998.

Decided July 1, 1999.

John R. Mercy, Texarkana, for Petitioner.

Ned A. Stewart, Jr., Texarkana, for Respondents.

Justice ABBOTT delivered the opinion of the Court, in which Chief Justice PHILLIPS, Justice HECHT, Justice ENOCH, Justice BAKER, Justice HANKINSON, Justice O'NEILL, and Justice GONZALES join.

In this case we determine whether three GTE Southwest, Incorporated employees may recover damages for intentional infliction of emotional distress based on the workplace conduct of their supervisor. The trial court rendered judgment for the employees on the jury verdict, and the court of appeals affirmed. 956 S.W.2d 636. We affirm the judgment of the court of appeals.

## I

### Facts

Three GTE employees, Rhonda Bruce, Linda Davis, and Joyce Poelstra, sued GTE for intentional infliction of emotional distress premised on the constant humiliating and abusive behavior of their supervisor, Morris Shields. Shields is a former U.S. Army supply sergeant who began working for GTE in 1971. Between 1981 and May 1991, Shields worked as a supervisor in GTE's supply department in Jacksonville, Arkansas. During his tenure there, four of Shields's subordinate employees (none of the employees involved in this case) filed formal grievances against Shields with GTE, alleging that Shields constantly harassed them. As a result of these complaints, GTE investigated Shields's conduct in 1988 and 1989, but took no formal disciplinary action against him.

In May 1991, GTE transferred Shields from Jacksonville to Nash, Texas, where he became the supply operations supervisor. The supply department at Nash was small, consisting of two offices and a store room. There were approximately eight employees other than Shields. Bruce, Davis, and Poelstra ("the employees") worked under Shields at the Nash facility. Like the GTE employees in Jacksonville, Bruce, Davis, and Poelstra complained to GTE of Shields's conduct, alleging that Shields constantly harassed and intimidated them. The employees complained about Shields's daily use of profanity, short temper, and his abusive and vulgar dictatorial manner. The employees complained that, among other offensive acts,

Shields repeatedly yelled, screamed, cursed, and even "charged" at them. In addition, he intentionally humiliated and embarrassed the employees.

GTE investigated these complaints in April 1992, after which GTE issued Shields a "letter of reprimand." After the reprimand, Shields discontinued some of his egregious conduct, but did not end it completely.

Eventually, Bruce, Davis, and Poelstra sought medical treatment for emotional distress caused by Shields's conduct. In March 1994, the employees filed suit, alleging that GTE intentionally inflicted emotional distress on them through Shields. The employees asserted no causes of action other than intentional infliction of emotional distress. The jury awarded $100,000.00 plus prejudgment interest to Bruce, $100,000.00 plus interest to Davis, and $75,000.00 plus interest to Poelstra.

## II

**The Texas Workers' Compensation Act**

■ GTE argues that, because it is a subscriber to the Texas Workers' Compensation Act, the employees' claim for intentional infliction of emotional distress is barred by the Act, which provides the exclusive remedy for an employee covered by workers' compensation insurance against an employer for a work-related injury. *See* TEX. LAB.CODE § 408.001. GTE contends that the Act provides compensation for the employees' injuries, and accordingly, the Act bars the employees' claims unless they can show that GTE committed an intentional tort. *See Massey v. Armco Steel Co.*, 652 S.W.2d 932, 933 (Tex.1983). The employees respond that the Act cannot bar their intentional infliction of emotional distress claim because their injuries are not in fact compensable under the Act.

The court of appeals held that the Act did not bar the employees' claims because GTE was alleged to have committed intentional acts by and through its supervisor,

Morris Shields. 956 S.W.2d at 639; *see Medina v. Herrera*, 927 S.W.2d 597, 600 (Tex.1996) (Act does not bar recovery for intentional torts directly attributable to the employer). Because it held that the tort was directly attributable to GTE, the court of appeals did not consider whether the employees' injuries were compensable under the Act in the first instance. We conclude that the employees' injuries are not compensable under the Act.

The employees allege that they suffered severe emotional distress, which manifested "in the form of tension, nervousness, anxiety, depression, loss of appetite, inability to sleep, crying spells, and uncontrollable emotional outbursts." Because of these problems, the employees sought medical and psychological treatment. GTE argues that the employees' emotional distress is a "compensable injury," defined by the Act as "an injury that arises out of and in the course and scope of employment for which compensation is payable under this subtitle," because the Act provides compensation for psychological services prescribed by a doctor. TEX. LAB.CODE §§ 401.011(10), 401.011(19)(C). Although the Act provides compensation for the types of medical care obtained by the employees, the definition of "injury" under the Act must still be satisfied before such compensation is allowed. Thus, we must determine whether the employees' allegations establish an "injury" for which compensation is payable under the Act.

The Act defines "injury" as "damage or harm to the physical structure of the body and a disease or infection naturally resulting from the damage or harm," including an occupational disease. *Id.* § 401.011(26). An "occupational disease" is defined as "a disease arising out of and in the course of employment that causes damage or harm to the physical structure of the body, including a repetitive trauma injury." *Id.* § 401.011(34). A "repetitive trauma injury" means "damage or harm to the physical structure of the body occurring as the result of repetitious, physically traumatic

activities that occur over time and arise out of and in the course and scope of employment." *Id.* § 401.011(36).

■ This Court has liberally construed the word "injury" in cases involving emotional distress and traumatic neurosis. *See Olson v. Hartford Accident & Indem. Co.,* 477 S.W.2d 859, 860 (Tex.1972). The phrase "physical structure of the body" refers to the entire body, and emotional distress may constitute an "injury" when it results in malfunctioning of the physical structure of the body. *Transportation Ins. Co. v. Maksyn,* 580 S.W.2d 334, 336–37 & n. 2 (Tex.1979); *Bailey v. American Gen. Ins. Co.,* 154 Tex. 430, 279 S.W.2d 315, 318–19 (1955).

We have previously considered whether an injury caused by repetitious mental traumatic activity rather than physical activity is compensable under the Act. In *Maksyn,* the employee suffered from "anxiety depression" attributed to long hours and stress. *Maksyn,* 580 S.W.2d at 334–35. We held that repetitive mental trauma resulting in injury is not a compensable occupational disease under the Act. *Id.* at 337–39. However, we also recognized that an employee may recover for an accidental injury due to mental trauma (as opposed to an occupational disease) when there is evidence of an undesigned, untoward event traceable to a definite time, place, and cause. *Id.* at 336–37; *see also Brown v. Texas Employers' Ins. Ass'n,* 635 S.W.2d 415, 416 (Tex.1982); *Olson,* 477 S.W.2d at 859–60.

GTE argues that the employees' injuries are traceable to a definite time, place, and cause—namely, Morris Shields's behavior toward the employees at GTE from March 1, 1992 to October 1, 1993. GTE relies on

*Director, State Employees Workers' Compensation Division v. Camarata,* 768 S.W.2d 427, 429 (Tex.App.—El Paso 1989, no writ), in which the court of appeals held the employee's post-traumatic stress syndrome to be a compensable accidental injury because it was traceable to the particular event of seeing a supervisor's memo criticizing his work performance.

A survey of the cases allowing recovery for accidental injuries due to mental trauma indicates that, in each case, as in *Camarata,* the injuries were caused by a particular exciting event. *See, e.g., Bailey,* 279 S.W.2d at 316 (traumatic neurosis suffered by worker on scaffold after almost falling from scaffold and seeing fellow worker fall to his death); *Hood v. Texas Indem. Ins. Co.,* 146 Tex. 522, 209 S.W.2d 345 (1948) (traumatic neurosis following single injury to foot and elbow); *Travelers Ins. Co. v. Garcia,* 417 S.W.2d 630 (Tex. Civ.App.—El Paso 1967, writ ref'd n.r.e.) (neurosis after experiencing armed robbery); *see also Maksyn,* 580 S.W.2d at 336–37 ("The ascertainable *single event,* though caused by mental stimuli, supported [the employee's] contention that he suffered an accidental injury.") (emphasis added); *Olson,* 477 S.W.2d at 860 ("The cases allowing recovery for heart attacks, strokes, and traumatic neuroses have involved particular events."). In contrast, we have found no case allowing recovery for injuries resulting from repetitive mental trauma. *See, e.g., Maksyn,* 580 S.W.2d at 338–39; *Olson,* 477 S.W.2d at 860; *Jackson v. Liberty Mut. Ins. Co.,* 580 S.W.2d 70, 71–72 (Tex.Civ.App.—El Paso 1979, writ ref'd n.r.e.) (evidence that truck driver's job was stressful was not an event sufficient to prove a compensable injury from a heart attack).[1]

---

1. In enacting the 1989 Workers' Compensation Act, the Legislature included a policy statement regarding mental trauma injuries. Section 408.006(a) states, "It is the express intent of the legislature that nothing in this subtitle shall be construed to limit or expand recovery in cases of mental trauma injuries." TEX. LAB.CODE § 408.006(a). Because the Act

did not change prior law in this area, mental trauma injuries are still generally compensable only if they result from an accidental event. The Legislature also included section 408.006(b), which states that "[a] mental or emotional injury that arises principally from a legitimate personnel action, including a transfer, promotion, demotion, or termination, is

Here, the employees alleged that the cause of their distress was the continuing harassment and abuse inflicted by Shields from May 1991 to October 1993. GTE does not point to any particular event that caused the mental distress, and instead refers to the scope of events occurring over two-and-a-half years. These allegations establish that the employees' injuries were caused by repetitive mental trauma rather than an ascertainable event. When there is no evidence of a particular event causing the mental injury, there can be no recovery under the Act. *Brown*, 635 S.W.2d at 416. Accordingly, the employees' injuries are not compensable under the Act. *See Olson*, 477 S.W.2d at 860; *Shannon v. Texas Gen. Indem. Co.*, 889 S.W.2d 662, 665 (Tex.App.—Houston [14th Dist.] 1994, no writ); *see also Chavis v. Director, State Worker's Compensation Div.*, 924 S.W.2d 439, 444 (Tex.App.—Beaumont 1996, no writ) ("[A] mental condition caused by a gradual buildup of emotional stress over a period of time is not compensable as an occupational disease without accompanying physical force or exertion.") (quoting *Shannon*, 889 S.W.2d at 664). Because the injuries are not compensable under the Act, the Act does not bar the employees' intentional infliction of emotional distress claims. Accordingly, we conclude, as the court of appeals did, that the employees' claims are not barred by the Act, although we do so on different grounds.

## III

### Intentional Infliction of Emotional Distress

An employee may recover damages for intentional infliction of emotional distress in an employment context as long as the employee establishes the elements of the cause of action. *See Wornick Co. v.*

*Casas*, 856 S.W.2d 732, 734 (Tex.1993). To recover damages for intentional infliction of emotional distress, a plaintiff must prove that: (1) the defendant acted intentionally or recklessly; (2) the conduct was extreme and outrageous; (3) the actions of the defendant caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe. *Standard Fruit & Vegetable Co. v. Johnson*, 985 S.W.2d 62, 65 (Tex.1998). In addition, "[a] claim for intentional infliction of emotional distress cannot be maintained when the risk that emotional distress will result is merely incidental to the commission of some other tort." *Id.* at 68. Accordingly, a claim for intentional infliction of emotional distress will not lie if emotional distress is not the intended or primary consequence of the defendant's conduct. *Id.*

GTE contests its liability for intentional infliction of emotional distress on several grounds. First, GTE argues that the alleged conduct does not rise to the level necessary to constitute extreme and outrageous conduct. Second, GTE argues that the employees did not prove that GTE, as opposed to Shields, had the requisite intent. And, third, GTE contends that the employees have not shown that they suffered severe emotional distress. We consider these arguments in turn.

### A. Extreme and Outrageous Conduct

GTE first argues that Shields's conduct is not extreme and outrageous. To be extreme and outrageous, conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Natividad v. Alexsis, Inc.*, 875 S.W.2d 695, 699 (Tex. 1994) (quoting *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex.1993)); RESTATEMENT

---

not a compensable injury under this subtitle." *Id.* § 408.006(b). Thus, even if a mental trauma injury can be traced to a definite time, place, and cause, it is still not compensable if it results from a legitimate personnel action.

Applying section 408.006(b), it is questionable whether *Camarata* correctly states the law. We, however, express no opinion on that issue.

(SECOND) OF TORTS § 46 cmt. d (1965). Generally, insensitive or even rude behavior does not constitute extreme and outrageous conduct. *Natividad,* 875 S.W.2d at 699. Similarly, mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities do not rise to the level of extreme and outrageous conduct. *See Porterfield v. Galen Hosp. Corp.,* 948 S.W.2d 916, 920 (Tex.App.—San Antonio 1997, writ denied); RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965).

In determining whether certain conduct is extreme and outrageous, courts consider the context and the relationship between the parties. *See Atchison, Topeka & Santa Fe Ry. v. Buell,* 480 U.S. 557, 569, 107 S.Ct. 1410, 94 L.Ed.2d 563 (1987) ("[S]ome States consider the context and the relationship between the parties significant, placing special emphasis on the workplace."); *Wilson v. Monarch Paper Co.,* 939 F.2d 1138, 1143 (5th Cir.1991) ("The facts of a given claim of outrageous conduct must be analyzed in context. . . ."). "The extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests." RESTATEMENT (SECOND) OF TORTS § 46 cmt. e (1965).

In the employment context, some courts have held that a plaintiff's status as an employee should entitle him to a greater degree of protection from insult and outrage by a supervisor with authority over him than if he were a stranger. *See, e.g., Alcorn v. Anbro Eng'g, Inc.,* 2 Cal.3d 493, 86 Cal.Rptr. 88, 468 P.2d 216, 218 n. 2 (1970); *White v. Monsanto Co.,* 585 So.2d 1205, 1209–10 (La.1991); *see also Bridges v. Winn–Dixie Atlanta, Inc.,* 176 Ga.App. 227, 335 S.E.2d 445, 448 (1985) ("[T]he existence of a special relationship in which one person has control over another, as in the employer-employee relationship, may produce a character of outrageousness that otherwise might not exist."); *Travis v. Alcon Labs., Inc.,* 202 W.Va. 369, 504 S.E.2d 419, 426–27 (1998). This approach is based partly on the rationale that, as opposed to most casual and temporary relationships, the workplace environment provides a captive victim and the opportunity for prolonged abuse. *See Coleman v. Housing Auth. of Americus,* 191 Ga.App. 166, 381 S.E.2d 303, 306 (1989).

In contrast, several courts, including Texas courts, have adopted a strict approach to intentional infliction of emotional distress claims arising in the workplace. *See, e.g., Miller v. Galveston/Houston Diocese,* 911 S.W.2d 897, 900–01 (Tex.App.—Amarillo 1995, no writ); *Amador v. Tan,* 855 S.W.2d 131, 135 (Tex.App.—El Paso 1993, writ denied); *Horton v. Montgomery Ward & Co.,* 827 S.W.2d 361, 369 (Tex.App.—San Antonio 1992, writ denied) ("Incidents in which a Texas court has determined the conduct to be extreme and outrageous in the employer/employee setting are few."); *see also Sterling v. Upjohn Healthcare Servs., Inc.,* 299 Ark. 278, 772 S.W.2d 329, 330 (1989) ("We have taken a strict view of claims for outrage in employment situations."). These courts rely on the fact that, to properly manage its business, an employer must be able to supervise, review, criticize, demote, transfer, and discipline employees. *See Johnson v. Merrell Dow Pharms., Inc.,* 965 F.2d 31, 34 (5th Cir.1992); *Sterling,* 772 S.W.2d at 330. Although many of these acts are necessarily unpleasant for the employee, an employer must have latitude to exercise these rights in a permissible way, even though emotional distress results. *See Miller,* 911 S.W.2d at 901; *Diamond Shamrock Ref. & Mktg. Co. v. Mendez,* 809 S.W.2d 514, 522 (Tex.App.—San Antonio 1991), *aff'd in part and rev'd in part on other grounds,* 844 S.W.2d 198 (Tex.1992); RESTATEMENT (SECOND) OF TORTS § 46 cmt. g (1965). We agree with the approach taken by these courts.

Given these considerations, Texas courts have held that a claim for intentional infliction of emotional distress does not lie for ordinary employment dis-

putes. *Miller*, 911 S.W.2d at 900–01; *see also Johnson*, 965 F.2d at 33. The range of behavior encompassed in "employment disputes" is broad, and includes at a minimum such things as criticism, lack of recognition, and low evaluations, which, although unpleasant and sometimes unfair, are ordinarily expected in the work environment. *See, e.g., Johnson*, 965 F.2d at 33–34; *Ulrich v. Exxon Co., U.S.A.*, 824 F.Supp. 677, 687 (S.D.Tex.1993). Thus, to establish a cause of action for intentional infliction of emotional distress in the workplace, an employee must prove the existence of some conduct that brings the dispute outside the scope of an ordinary employment dispute and into the realm of extreme and outrageous conduct. *See Ramirez v. Allright Parking El Paso, Inc.*, 970 F.2d 1372, 1376 (5th Cir.1992) (requiring employee to show conduct "elevating [the employer's] actions above those involved in an 'ordinary employment dispute' "). Such extreme conduct exists only in the most unusual of circumstances.[2] *See Porterfield*, 948 S.W.2d at 920–21 ("Only in the most unusual of employment cases does the conduct move out of the 'realm of an ordinary employment dispute' and into the classification of extreme and outrageous . . . ."); *see also Wilson v. Monarch Paper Co.*, 939 F.2d 1138, 1143 (5 th Cir.1991).

▆ GTE contends that the evidence establishes nothing more than an ordinary employment dispute. To the contrary, the employees produced evidence that, over a period of more than two years, Shields engaged in a pattern of grossly abusive, threatening, and degrading conduct. Shields began regularly using the harshest vulgarity shortly after his arrival at the Nash facility. In response, Bruce and Davis informed Shields that they were uncomfortable with obscene jokes, vulgar cursing, and sexual innuendo in the office. Despite these objections, Shields continued to use exceedingly vulgar language on a daily basis. Several witnesses testified that Shields used the word "f——" as part of his normal pattern of conversation, and that he regularly heaped abusive profanity on the employees. Linda Davis testified that Shields used this language to get a reaction. Gene Martin, another GTE employee, testified that Shields used the words "f——" and "motherf——er" frequently when speaking with the employees. On one occasion when Bruce asked Shields to curb his language because it was offensive, Shields positioned himself in front of her face, and screamed, "I will do and say any damn thing I want. And I don't give a s—— who likes it." Another typical example is when Gene Martin asked Shields to stop his yelling and vulgarity because it upset the female employees, and Shields replied "I'm tired of walking on f——ing eggshells, trying to make people happy around here." There was further evidence that Shields's harsh and vulgar language was not merely accidental, but seemed intended to abuse the employees.

More importantly, the employees testified that Shields repeatedly physically and verbally threatened and terrorized them. There was evidence that Shields was continuously in a rage, and that Shields would frequently assault each of the employees by physically charging at them. When doing so, Shields would bend his head down, put his arms straight down by his sides, ball his hands into fists, and walk quickly toward or "lunge" at the employees, stopping uncomfortably close to their faces while screaming and yelling. The

**2.** For example, in *Dean v. Ford Motor Credit Co.*, 885 F.2d 300, 307 (5 th Cir.1989), the court recognized that the supervisor's act of placing checks in the employee's purse to make it appear that she was a thief and to put her in fear of criminal prosecution was extreme and outrageous. In addition, in *Wilson v. Monarch Paper Co.*, 939 F.2d 1138, 1145 (5 th Cir.1991), the court held that the employer's intentional and systematic actions to humiliate the plaintiff, a long-time executive with a college education and 30 years experience, and to force him to quit by requiring him to do menial, janitorial duties was extreme and outrageous. *See also Ramirez*, 970 F.2d at 1376 (discussing *Wilson* ).

employees were exceedingly frightened by this behavior, afraid that Shields might hit them. Linda Davis testified that Shields charged the employees with the intent to frighten them. At least once, another employee came between Shields and Poelstra to protect her from Shields's charge. A number of witnesses testified that Shields frequently yelled and screamed at the top of his voice, and pounded his fists when requesting the employees to do things. Bruce testified that Shields would "come up fast" and "get up over her"—causing her to lean back—and yell and scream in her face for her to get things for him. Shields included vulgar language in his yelling and screaming. Bruce stated that such conduct was not a part of any disciplinary action against her. Further, the incidents usually occurred in the open rather than in private. Bruce testified that, on one occasion, Shields began beating a banana on his desk, and when he jumped up and slammed the banana into the trash, Bruce thought he would hit her. Afterwards, Shields was shaking and said "I'm sick."

Bruce also told of an occasion when Shields entered Bruce's office and went into a rage because Davis had left her purse on a chair and Bruce had placed her umbrella on a filing cabinet in the office. Shields yelled and screamed for Bruce to clean up her office. Shields yelled, "If you don't get things picked up in this office, you will not be working for me." He later said that Bruce and Davis would be sent to the unemployment line and "could be replaced by two Kelly girls" that were twenty years old. On another occasion, Shields came up behind Bruce and said, "You're going to be in the unemployment line." Once he told Bruce that he had been sent to Nash to fire her. Another time, he typed "quit" on his computer and said, "That's what you can do." Davis testified that Shields threatened to "get them" for complaining about his behavior. And both Bruce and Martin testified that Shields had stated that "he was in a position to get even for what [the employees] had done."

. Bruce also testified that Shields called her into his office every day and would have her stand in front of him, sometimes for as long as thirty minutes, while Shields simply stared at her. Bruce was not allowed to leave Shields's office until she was dismissed, even though Shields would periodically talk on the phone or read papers. This often occurred several times a day. Bruce testified that it made her nauseated and intimidated her. On one occasion, Shields backed Bruce into a corner, leaned over her, and said, "Rumor has it that you know how to get anything you want out here." During an annual review, Shields said to Bruce, "You're mean and you're deadly, very deadly." Davis also testified that Shields would stand over her desk and stare at her.

Shields required Bruce and Davis, both general clerks at GTE, to purchase vacuum cleaners with company funds and to vacuum their offices daily, despite the fact that the company had a cleaning service that performed janitorial services such as vacuuming. The purpose of this seemed not to clean, but to humiliate. Bruce testified that she was ridiculed by other employees. Shields also yelled and screamed when he discovered a spot on the carpet; he made Bruce get on her hands and knees and clean the spots while he stood over her yelling. Poelstra testified that Shields required her to clean tobacco stains from a wall in the warehouse. Poelstra testified that, after she forgot her paperwork for a driving test, Shields ordered her to wear a post-it note on her shirt that said, "Don't forget your paperwork." Other witnesses corroborated the employees' testimony about Shields's conduct.

In considering whether the evidence establishes more than an ordinary employment dispute, we will also address GTE's argument that because none of Shields's acts standing alone rises to the level of outrageous conduct, the court of appeals erred in holding that, considered cumula-

tively, the conduct was extreme and outrageous. *956 S.W.2d at 644, 647.*

As already noted, the employees demonstrated at trial that Shields engaged in a course of harassing conduct directed at each of them, the totality of which caused severe emotional distress. It is well recognized outside of the employment context that a course of harassing conduct may support liability for intentional infliction of emotional distress. *See, e.g., Duty v. General Fin.* Co., 154 Tex. 16, 273 S.W.2d 64, 65–66 (1954) (debt collection). In such cases, courts consider the totality of the conduct in determining whether it is extreme and outrageous. *See id.* (analyzing creditor's entire course of conduct, including repetitive threatening phone calls and letters).

Similarly, in the employment context, courts and commentators have almost unanimously recognized that liability may arise when one in a position of authority engages in repeated or ongoing harassment of an employee, if the cumulative quality and quantity of the harassment is extreme and outrageous. *See Wornick,* 856 S.W.2d at 736 (recognizing that a number of cases in which courts have found extreme and outrageous conduct "involved repeated or ongoing harassment of an employee"); EDGAR & SALES, TEXAS TORTS AND REMEDIES § 45.09[3], at 45–63 (July 1998) ("[R]epeated or ongoing harassment of the employee is likely to be considered outrageous conduct."); *see also, e.g., Howard Univ. v. Best,* 484 A.2d 958, 986 (D.C.1984) ("This evidence of a pattern of harassment was sufficient for the jury to find that [defendant] intentionally and recklessly subjected [plaintiff] to outrageous conduct...."); *White,* 585 So.2d at 1210 ("Recognition of a cause of action for intentional infliction of emotional distress in a workplace environment has usually been limited to cases involving a pattern of deliberate, repeated harassment over a period of time."); *Boyle v. Wenk,* 378 Mass. 592, 392 N.E.2d 1053, 1056 (1979) ("Repeated harassment ... may compound the

outrageousness of incidents which, taken individually, might not be sufficiently extreme to warrant liability....").

When such repeated or ongoing harassment is alleged, the offensive conduct is evaluated as a whole. *See, e.g., Subbe–Hirt v. Baccigalupi,* 94 F.3d 111, 114–15 (3d Cir.1996) (considering employee's evidence that supervisor repeatedly threatened, cursed and embarrassed employee and engaged in process called "root canal" sufficient to show extreme and outrageous behavior); *Lightning v. Roadway Express, Inc.,* 60 F.3d 1551, 1554–55, 1558 (11th Cir.1995) (considering the "totality of the circumstances," district court properly entered judgment on evidence that supervisors repeatedly verbally abused and insulted employee, on one occasion tried to hit employee, on another occasion spat on employee, threatened employee, and engaged in concerted effort to provoke and demean employee); *Coleman,* 381 S.E.2d at 306 (recognizing that although some of the incidents standing alone would not amount to actionable infliction of emotional distress, the repetition, over plaintiff's protests, could be found to have a cumulative effect); *Walters v. Rubicon Inc.,* 706 So.2d 503, 507 (La.Ct.App.1997) (evidence that supervisor continuously cursed at, screamed at, and threatened plaintiff, and required him to engage in activities he believed were illegal was sufficient to show extreme and outrageous conduct); *Travis,* 504 S.E.2d at 423 (considering totality of abusive conduct over a four-year period); *Kanzler v. Renner,* 937 P.2d 1337, 1343 (Wyo.1997) (concluding that extreme and outrageous conduct was shown by "repeated incidents over a period of several weeks in which [plaintiff's supervisor] stared at [plaintiff], followed her, and subjected her to sexually-motivated advances and physically intimidating behavior"). *Cf. Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (emphasizing that whether harassment is severe "should be judged from the perspective of a reasonable per-

son in the plaintiff's position, considering 'all the circumstances' "); *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982) ("Whether sexual harassment at a workplace is sufficiently severe and persistent ... is a question to be determined with regard to the totality of the circumstances."), *cert. denied*, 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987) (quoted in *Jones v. Flagship Int'l*, 793 F.2d 714, 720 (5th Cir.1986)).

In addition to the court of appeals in this case, at least two other Texas courts of appeals have followed this approach. *See Qualicare, Inc. v. Runnels*, 863 S.W.2d 220, 223 (Tex.App.—Eastland 1993, no writ) (considering as a whole evidence that supervisor made repeated threats and phone calls, surveilled the employees, and sent a black floral arrangement as a death threat); *American Med. Int'l, Inc. v. Giurintano*, 821 S.W.2d 331, 340–42 (Tex. App.—Houston [14[th] Dist.] 1991, no writ) (considering as a whole evidence that hospital administrators spread rumors, yelled at, cursed, and insulted plaintiff as part of conspiracy to engage plaintiff in confrontations and use his responses to oppose his appointment). GTE cites no cases to the contrary. And amicus curiae Texas Employment Law Council cites only one court adopting a contrary view. *See Denton v. Chittenden Bank*, 163 Vt. 62, 655 A.2d 703, 706 (1994) ("Absent at least one incident of behavior that transcends the ignoble and vast realm of unpleasant and often stressful conduct in the workplace, incidents that are in themselves insignificant should not be consolidated to arrive at the conclusion that the overall conduct is outrageous.").[3]

■ We agree with the overwhelming weight of authority in this state and around the country that when repeated or ongoing severe harassment is shown, the conduct should be evaluated as a whole in determining whether it is extreme and outrageous. Accordingly, we hold that the court of appeals did not err in doing so.

■ We now consider whether Shields's conduct, taken as a whole, amounts to extreme and outrageous conduct. "It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery...." *Wornick*, 856 S.W.2d at 734 (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. h (1965)). When reasonable minds may differ, however, it is for the jury, subject to the court's control, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability. RESTATEMENT (SECOND) OF TORTS § 46 cmt. h. To support liability for intentional infliction of emotional distress, it is not enough that the defendant has acted with an intent that is tortious, malicious, or even criminal, or that he has intended to inflict emotional distress. *Id.* § 46 cmt. d. Although the defendant's intent is relevant, the conduct itself must be extreme and outrageous to support liability. *See Brewerton v. Dalrymple*, 997 S.W.2d 212, 216 (Tex.1999).

GTE argues that the conduct complained of is an ordinary employment dispute because the employees' complaints are really that Shields was a poor supervisor with an objectionable management style. *See Porterfield*, 948 S.W.2d at 921 (fact that supervisor is discourteous or demanding is insufficient for liability); *see also Ulrich*, 824 F.Supp. at 687 ("[P]ersonality conflicts with a supervisor certainly are not uncommon occurrences, nor do they give rise to an actionable legal wrong."). GTE also contends that the ac-

---

**3.** Notably, two of the five justices sitting in that case dissented, stating that "[t]he law is clear ... that a series of incidents may be considered together to determine if the conduct alleged is extreme and outrageous." *Denton*, 655 A.2d at 710 (Gibson, J., dissenting). They further noted that, in the court's own precedent and in each of the cases cited by the majority, the courts had considered all of the defendants' acts together rather than individually in determining whether the conduct was outrageous. *Id.* at 711 (Gibson, J., dissenting).

tions are employment disputes because Shields committed the acts in the course of disciplining his employees.

■ We recognize that, even when an employer or supervisor abuses a position of power over an employee, the employer will not be liable for mere insults, indignities, or annoyances that are not extreme and outrageous. RESTATEMENT (SECOND) OF TORTS § 46 cmt. e (1965). But Shields's ongoing acts of harassment, intimidation, and humiliation and his daily obscene and vulgar behavior, which GTE defends as his "management style," went beyond the bounds of tolerable workplace conduct. *See Travis,* 504 S.E.2d at 423; *White,* 585 So.2d at 1210. The picture painted by the evidence at trial was unmistakable: Shields greatly exceeded the necessary leeway to supervise, criticize, demote, transfer, and discipline, and created a workplace that was a den of terror for the employees. And the evidence showed that all of Shields's abusive conduct was common, not rare. Being purposefully humiliated and intimidated, and being repeatedly put in fear of one's physical well-being at the hands of a supervisor is more than a mere triviality or annoyance. *See Kanzler,* 937 P.2d at 1343; *see also* RESTATEMENT (SECOND) OF TORTS § 46 illus.2 (1965) (defendant who threatens and extorts plaintiff liable when plaintiff suffers severe emotional distress).

Occasional malicious and abusive incidents should not be condoned, but must often be tolerated in our society. But once conduct such as that shown here becomes a regular pattern of behavior and continues despite the victim's objection and attempts to remedy the situation, it can no longer be tolerated. It is the severity and regularity of Shields's abusive and threatening conduct that brings his behavior into the realm of extreme and outrageous conduct. Conduct such as being regularly assaulted, intimidated, and threatened is not typically encountered nor expected in the course of one's employment, nor should it be accepted in a civilized society.

An employer certainly has much leeway in its chosen methods of supervising and disciplining employees, but terrorizing them is simply not acceptable. If GTE or Shields was dissatisfied with the employees' performance, GTE could have terminated them, disciplined them, or taken some other more appropriate approach to the problem instead of fostering the abuse, humiliation, and intimidation that was heaped on the employees. Accordingly, the trial court properly submitted the issue to the jury, and there was some evidence to support the jury's conclusion that Shields's conduct was extreme and outrageous.

## B. Intent

■ GTE argues that the employees failed to establish that GTE, as opposed to Shields, possessed the requisite intent to support GTE's liability. The jury found that Shields intentionally inflicted emotional distress on the employees. The jury further found that Shields was acting in the scope of his employment. GTE contends that these findings are insufficient to support GTE's liability because the jury never found that GTE acted with the requisite intent. GTE relies on the fact that the jury failed to find that GTE ratified Shield's intentional infliction of emotional distress and failed to find that GTE acted "with malice." GTE further contends that the jury's finding that Shields was acting in the scope of his employment is insufficient for liability because, GTE argues, an employer is never liable for an employee's intentional or malicious acts that are unforeseeable considering the employee's duties, and there was no finding that Shields's intentional acts were foreseeable by GTE.

■ Generally, a master is vicariously liable for the torts of its servants committed in the course and scope of their employment. *Medina v. Herrera,* 927 S.W.2d 597, 601 (Tex.1996); RESTATEMENT (SECOND) OF AGENCY § 219(1) (1958). This is true even though the employee's tort is

intentional when the act, although not specifically authorized by the employer, is closely connected with the servant's authorized duties. *See Medina*, 927 S.W.2d at 601 (citing *Texas & Pac. Ry. v. Hagenloh*, 151 Tex. 191, 247 S.W.2d 236, 239 (1952)); *Ramos v. Frito–Lay, Inc.*, 784 S.W.2d 667, 668 (Tex.1990). If the intentional tort is committed in the accomplishment of a duty entrusted to the employee, rather than because of personal animosity, the employer may be liable. *See Soto v. El Paso Natural Gas Co.*, 942 S.W.2d 671, 681 (Tex.App.—El Paso 1997, writ denied). Shields's acts, although inappropriate, involved conduct within the scope of his position as the employees' supervisor. *See Hooper v. Pitney Bowes, Inc.*, 895 S.W.2d 773, 777–78 (Tex.App.—Texarkana 1995, writ denied); *Bushell v. Dean*, 781 S.W.2d 652, 659 (Tex.App.—Austin 1989), *rev'd on other grounds*, 803 S.W.2d 711 (Tex.1991); *Southwestern Bell Tel. Co. v. Wilson*, 768 S.W.2d 755, 759 (Tex.App.—Corpus Christi 1988, writ denied). GTE admitted as much when it argued that Shields's acts were "mere employment disputes." GTE has cited no evidence that Shields's actions were motivated by personal animosity rather than a misguided attempt to carry out his job duties. The jury concluded that Shields's acts were committed in the scope of his employment, and there is some evidence to support this finding. Thus, GTE is liable for Shields's conduct. *See Travis*, 504 S.E.2d at 431–32.

▮▮▮ Moreover, regardless of whether Shields acted within the scope of his employment, his status as a vice-principal of the corporation is sufficient to impute liability to GTE with regard to his actions taken in the workplace. *Cf. Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 391–92 (Tex.1997) (corporations may be liable for punitive damages for torts committed by vice-principals). Corporations can act only through their agents. *Id.* at 391; *Fort Worth Elevators Co. v. Russell*, 123 Tex. 128, 70 S.W.2d 397, 402 (1934), *disapproved in part on other*

grounds by *Wright v. Gifford–Hill & Co.*, 725 S.W.2d 712, 714 (Tex.1987). When actions are taken by a vice-principal of a corporation, those acts may be deemed to be the acts of the corporation itself. *Fort Worth Elevators*, 70 S.W.2d at 406. A vice-principal represents the corporation in its corporate capacity, and includes persons who have authority to employ, direct, and discharge servants of the master, and those to whom a master has confided the management of the whole or a department or division of his business. *See Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 922 (Tex.1998). The jury found that Shields was a vice-principal of GTE. It is undisputed that Shields was the highest ranking management person stationed at the Nash facility, and that Shields had authority to employ, direct, and discharge employees. This evidence is sufficient to support the jury's finding. Accordingly, the court of appeals correctly concluded that Shields's acts were the acts of GTE.

## C. Severe Emotional Distress

▮▮▮ GTE next contends that any distress the employees suffered was not severe. GTE argues that the employees' complaints of embarrassment, fear, stomach aches, loss of sleep, and headaches "are problems that are normally dealt with by each of us in every day life."

▮▮▮ Emotional distress includes all highly unpleasant mental reactions such as embarrassment, fright, horror, grief, shame, humiliation, and worry. *See Washington v. Knight*, 887 S.W.2d 211, 216 (Tex.App.—Texarkana 1994, writ denied); *Havens v. Tomball Community Hosp.*, 793 S.W.2d 690, 692 (Tex.App.—Houston [1st Dist.] 1990, writ denied). Severe emotional distress is distress that is so severe that no reasonable person could be expected to endure it. *Washington*, 887 S.W.2d at 216. The employees testified that, as a result of being exposed to Shields's outrageous conduct, they experienced a variety of emotional problems, including crying spells, emotional outbursts, nausea, stomach dis-

orders, headaches, difficulty in sleeping and eating, stress, anxiety, and depression. The employees testified that they experienced anxiety and fear because of Shields's continuing harassment, especially his charges and rages. Each employee sought medical treatment for these problems, and all three plaintiffs were prescribed medication to alleviate the problems. An expert witness testified that each of them suffered from post-traumatic stress disorder. This evidence is legally sufficient to support the jury's finding that the employees suffered severe emotional distress.

## IV

### Limitations

GTE contends that not all of Shields's conduct should have been considered by the jury. Specifically, GTE argues that the court of appeals erred in considering evidence of Shields's conduct before March 1, 1992 because it occurred outside the two-year period of limitations for intentional infliction of emotional distress.[4] Much of the employees' evidence concerned Shields's conduct before March 1, 1992; some of the evidence focused on his conduct after that date. Significantly, GTE did not object to the admission of evidence concerning Shields's conduct before March 1, 1992, even though it had filed a motion in limine asking the court to prohibit "[a]ny mention of any words, acts, or deeds of Morris Shields, any other employee or representative of GTE or GTE which occurred prior to March 1, 1992."

GTE relies on *Stroud v. VBFSB Holding Corp.*, 917 S.W.2d 75 (Tex.App.—San Antonio 1996, writ denied), for the proposition that, "as a matter of law" the jury could not base its answers on any facts occurring more than two years before March 1, 1994. In *Stroud,* the employee brought suit on June 29, 1993, alleging intentional infliction of emotional distress. He had resigned by early June 1991. The court of appeals recognized that *all* of the

acts complained of occurred before June 29, 1991. *Id.* at 82. Based on this fact, the court correctly held that limitations barred the intentional infliction of emotional distress claim. *Id.* The cause of action necessarily accrued more than two years before Stroud filed suit. Accordingly, *Stroud* does not support GTE's position.

A more analogous case is *Soto v. El Paso Natural Gas Co.*, 942 S.W.2d 671, 677 (Tex.App.—El Paso 1997, writ denied). In *Soto,* some of the offensive conduct occurred within the two-year period preceding suit, and some before that time. The Eighth Court of Appeals held that evidence of events occurring outside the limitations period was relevant "to show the atmosphere in which those events which precipitated th[e] lawsuit occurred," but could not be the basis for legal redress. *Id.* Assuming without deciding that this is correct, the court of appeals properly held that GTE waived its complaint to the admission of the evidence for all purposes because it did not object to the admission of the evidence as a basis for legal redress and did not ask the court to instruct the jury accordingly.

## V

### Expert Testimony

Last, GTE complains about the trial court's admission of expert testimony that Shields's conduct was extreme and outrageous. The employees obtained opinion evidence from three different expert witnesses that Shields's conduct was extreme and outrageous. GTE objected to this testimony at trial, and complained of the trial court's admission of the testimony of two of the witnesses on appeal.

The court of appeals held that the trial court's admission of expert testimony on the issue of whether Shields's conduct was extreme and outrageous was error. 956 S.W.2d at 641. We agree. "[A]n expert may state an opinion on a

4. The employees filed suit on March 1, 1994.

mixed question of law and fact as long as the opinion is confined to the relevant issues and is based on proper legal concepts." *Birchfield v. Texarkana Mem'l Hosp.*, 747 S.W.2d 361, 365 (Tex.1987). But to be admissible, expert testimony must generally involve "scientific, technical, or other specialized knowledge" as to which a witness could be qualified as an expert by "knowledge, skill, experience, training, or education," and it must assist the trier of fact. TEX.R. EVID. 702; *Warner v. Hurt*, 834 S.W.2d 404, 406 (Tex.App.—Houston [14 th Dist.] 1992, no writ) ("Admissibility of the expert's opinion hinges on whether or not the expert has special knowledge concerning [the] matter on which his opinion is sought."). Except in highly unusual circumstances, expert testimony concerning extreme and outrageous conduct would not meet this standard. Where, as here, the issue involves only general knowledge and experience rather than expertise, it is within the province of the jury to decide, and admission of expert testimony on the issue is error.

Nevertheless, the court of appeals correctly concluded that the error was harmless. The court applied our reasoning in *Louder v. De Leon*, 754 S.W.2d 148, 149 (Tex.1988), that "[j]urors realize that they are the final triers to decide the issues. They may accept or reject an expert's view. Thus there is little danger in an expert's answer to an all-embracing question on a mixed question of law and fact."

Texas Rule of Appellate Procedure 44.1(a)(1) mandates that no judgment may be reversed on appeal on the ground that the trial court made an error of law unless the error complained of probably caused the rendition of an improper judgment. TEX.R.APP. P. 44.1(a)(1). GTE argues that "it is inconceivable that expert opinion on the ultimate issue could be harmless." To demonstrate that it was harmed by the expert's testimony, GTE relies solely on the jury's answers to the charge, pointing out that the jury did not find malice, upon which there was no expert opinion, but did

find intentional infliction of emotional distress, upon which there was expert testimony. This questionable logic is insufficient to demonstrate that admitting the testimony harmed GTE. *See Templeton v. Dreiss*, 961 S.W.2d 645, 672 (Tex.App.—San Antonio 1998, pet. denied). Absent the expert testimony, there was an abundance of evidence from the employees and other witnesses establishing the continuing assaults and humiliation by Shields. At most, the expert testimony GTE finds objectionable was merely cumulative of evidence demonstrating that Shields's conduct amounts to intentional infliction of emotion distress. *See Southwestern Elec. Power Co. v. Burlington N. R.R.*, 966 S.W.2d 467, 474 (Tex.1998). This nonexpert testimony is sufficient to support the jury's verdict.

\* \* \* \* \*

In sum, we hold that the employees' claims are not barred by the Workers' Compensation Act because their injuries are not compensable under the Act. We conclude that there is legally sufficient evidence to support the jury's verdict against GTE on each of the employees' claims for intentional infliction of emotional distress. We further conclude that GTE waived any complaint about evidence of Shields's conduct before March 1, 1992 because GTE did not object to the evidence at trial. And, although the trial court erred in admitting expert testimony about whether Shields's conduct was extreme and outrageous, such error was harmless. Accordingly, we affirm the court of appeals' judgment.

Justice OWEN filed a concurring opinion.

Justice OWEN, concurring.

I agree that there is more than a scintilla of evidence to support the jury's finding that Shields intentionally inflicted emotional distress on the plaintiffs. I cannot join the Court's opinion because most of the testimony that the Court recounts is legal-

ly insufficient to support the verdict in this case.

There was evidence that Shields physically threatened, although he did not touch, the plaintiffs. There was also evidence of sustained and threatening sexual harassment and that some of Shields's profanity was uttered at the same time that he sexually harassed or physically threatened the plaintiffs. That conduct was sufficient to permit a jury to conclude that Shields had intentionally inflicted emotional distress on the plaintiffs.

But regardless of how long and how often most of the conduct cataloged by the Court may have been committed in the workplace, it does not meet the rigorous standard for intentional infliction of emotional distress set forth in the RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965) or in this Court's decisions applying that section. The following conduct is not a basis for sustaining a cause of action for intentional infliction of emotional distress, even when the employees who are upset by the conduct are women:

- cursing, profanity, or "yelling and screaming" when it was not simultaneously accompanied by sexual harassment or physically threatening behavior
- pounding fists on a table when requesting employees "to do things"
- going into "a rage" when employees leave an umbrella or purse on a chair or filing cabinet
- screaming at employees that if they do not "get things picked up" they will be fired
- telling an employee that she would be sent to the unemployment line
- telling an employee that she could be replaced by two Kelly girls
- a supervisor's statement to an employee that he had been sent to fire her
- typing "quit" on a computer and telling an employee that is what she can do

- requiring employees to vacuum their offices daily even though a janitorial service vacuums as well
- requiring an employee to clean a spot off the carpet while "yelling" over her
- requiring an employee to clean tobacco stains off a wall
- telling an employee that she must wear a post-it note that says "don't forget your paperwork."

Most of the foregoing conduct would be offensive and degrading in most circumstances. But it is not " 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Twyman v. Twyman,* 855 S.W.2d 619, 621 (Tex.1993) (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965)). As we recently observed in *Brewerton v. Dalrymple,* 997 S.W.2d 212 (Tex.1999), the fact that an action is intentional, malicious, or even criminal does not mean that it is extreme or outrageous for purposes of the tort of intentional infliction of emotional distress, as the Restatement explains:

It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965).

The Court's conclusion that there is evidence of intentional infliction of emotional distress because Shields suggested to and even threatened the plaintiffs that they may be discharged or replaced is particularly inconsistent with our prior decisions. We have held that discharging an employee, even when it amounted to wrongful discharge under our laws, did not amount to intentional infliction of emotional distress. *See Southwestern Bell Mobile Sys., Inc. v. Franco,* 971 S.W.2d 52, 54–55 (Tex. 1998); *see also Brewerton,* 997 S.W.2d at

216; *Wornick Co. v. Casas,* 856 S.W.2d 732, 735–36 (Tex.1993). We have said that firing an employee in front of her co-workers and then having her escorted off the premises by a security guard was not the type of conduct that could support a finding of intentional infliction of emotional distress. *See Wornick Co.,* 856 S.W.2d at 736. I fail to see how screaming at a plaintiff that she may be fired is conduct of a degree and character that is actionable when actually firing an employee in the presence of her co-workers and physically escorting her off the premises with uniformed security guards is not.

The Court's conclusion that cursing and profanity may constitute intentional infliction of emotional distress is also inconsistent with a specific example given by the Restatement in which highly profane language is used. *See* RESTATEMENT (SECOND) OF TORTS § 46 cmt. d, illus. 4 (1965). I fail to see how using a profane word ten or even a hundred times is intentional infliction of emotional distress when that cursing is not directed at the plaintiff and is not simultaneously accompanied by sexual harassment or physically threatening behavior.

Because the Court's writing is far too broad and in some respects unfaithful to our precedent, I cannot join the Court's opinion.