**GTE SOUTHWEST, INCORPORATED, Appellant,**

v.

**Rhonda BRUCE, Linda Davis, and Joyce Poelstra, Appellees.**

No. 06–96–00029–CV.

Court of Appeals of Texas, Texarkana.

Submitted April 8, 1997.

Decided Oct. 20, 1997.

Rehearing Overruled Nov. 25, 1997.

John R. Mercy, Atchley, Russell, Waldrop, Texarkana, for appellant.

Ned Stewart, Jr., Autrey, Autrey, Stewart, Texarkana, for appellee.

Before CORNELIUS, C.J., and GRANT and ROSS, JJ.

## OPINION

GRANT, Justice.

This is an action for damages for intentional infliction of emotional distress. Rhonda Bruce, Linda Davis, and Joyce Poelstra, GTE employees (employees), filed suit against GTE for intentional infliction of emotional distress by the conduct of their supervisor, Morris Shields. The jury awarded $275,000.00 plus prejudgment interest against GTE.

GTE appeals and in seventeen points of error (1) contends that the suit is barred by the Texas Workers' Compensation Act, (2) contends there were conflicting jury answers, (3) challenges the admission of evidence of conduct occurring prior to March 1, 1992, (4) challenges the admission of opinion testimony that Shields' behavior was outrageous conduct, (5) contends that GTE lacked the requisite intent, (6) challenges the damage award, and (7) challenges the legal and factual sufficiency of the evidence.

■ GTE takes the position that because the employees were in the scope of employment at the time the acts occurred, this common-law tort claim would be barred by the Workers' Compensation Act, citing *Horton v. Montgomery Ward & Co.*[1] In *Horton*, however, the wrongdoer was the plaintiff's fellow employee, not a supervisor, as in the present case. *Horton* stands for the proposition that the intent of the employer, not that of a fellow employee, places a claim outside the Workers' Compensation Act. *Horton* is distinguishable from the present case and does not control.

In *Medina v. Herrera*,[2] the Texas Supreme Court held that the Workers' Compensation Act does not apply to workers' claims of intentional tort by an employer. There are numerous cases so holding in Texas, and most of them refer back to *Middleton v. Texas Power & Light Co.*[3] Middleton and its progeny clearly removed from the Act's coverage intentional torts attributable directly to an employer.[4] These cases generally base this holding on a constitutional basis. The *Middleton* case, in dealing with the constitutionality of the Workers' Compensation Act, held that Section 13 of the Texas Bill of Rights was not violated by the Workers' Compensation Act because the Act only applied to common-law actions for negligence, not to intentional wrongs because that cause of action was a constitutional right. The first Workers' Compensation Act in Texas was passed in 1913, and its nonapplicability to intentional acts by the employer is a nationwide standard, and although this specific lan-

---

1. 827 S.W.2d 361, 365 (Tex.App.—San Antonio 1992, writ denied).

2. 927 S.W.2d 597 (Tex.1996).

3. 108 Tex. 96, 185 S.W. 556 (1916).

4. *Medina,* 927 S.W.2d at 600–01.

guage does not appear in the Workers' Compensation Act, it is a matter of case law and a matter of a provision in the standard workers' compensation policies that makes it applicable only to accidents. Therefore, in the present case, in which the corporation is alleged to have committed intentional acts by and through its supervisor, the Workers' Compensation Act does not stand as a bar.[5] This point of error is overruled.

■ Next, GTE claims that the answers to Questions 2 and 7 conflict, negating the requisite intent. In answering Question 2, the jury found that *Shields* intentionally inflicted emotional distress on each of the employees. In answering Question 7, the jury found that *GTE* did not act with malice.

The threshold question of conflicting jury answers is whether the findings are about the same material fact. If so, and they can be reasonably reconciled in any way, they should be. Even if there is a conflict, before reversal is required it must be shown that to delete one of the answers would provide a judgment for the other side.[6]

Second, the finding must be interpreted, if possible, in such a manner as to uphold the judgment.[7]

The jury refused to give any punitive damage, finding that GTE did not act with malice. This does not mean that the jury found that Shields, acting on behalf of the company, did not intend his acts.

In the present case, we find that the answers are reconcilable, but even if we deleted Question 6, it would not change the verdict in the present case, because the jury did not

find malice and no exemplary damages were awarded.

■ GTE contends that the trial court erred in admitting evidence of Shields' conduct occurring before March 1, 1992, because the statute of limitations barred admission of the evidence. A two-year statute of limitations is applicable to this tort.[8] GTE pleaded the statute of limitations; however, GTE did not object when evidence of the conduct outside the statute of limitations was introduced. The first question posed to the jury was "Did any of the persons listed below (the plaintiffs were listed) not file suit against GTE within the two years from the date their cause of action accrued?" The jury was instructed that the lawsuit was filed on March 1, 1994.

In the case of *Soto v. El Paso Natural Gas Co.*,[9] the El Paso Court of Appeals faced a similar problem in a case in which incidents occurred that could not be considered in the merits of the case because they were barred by limitations. Soto claimed sexual harassment based on hostile work environment. The court allowed such evidence on the basis that the evidence was relevant to show the atmosphere in which the events that precipitated the lawsuit occurred.[10]

Because GTE failed to object to the evidence that it contends was barred by the statute of limitations or make any request for instructions to the jury at the time this evidence was admitted, GTE has waived that objection. The record is clear that the entire conduct of Shields was not barred by the statute of limitations, so GTE had the duty to move to sever the conduct or, in the event that it was significant for background purposes only, to ask the court to instruct the

---

5. In some of the cases, such as *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 933 (Tex.1983), the Court dealt with situations in which the worker had filed workers' compensation and there was a question of waiver. In the present case, we are not faced with the situation in which the employee had elected to go under the Workers' Compensation Act.

6. *Luna v. Southern Pacific Transp. Co.*, 724 S.W.2d 383 (Tex.1987).

7. *Jackson v. United States Fidelity & Guar. Co.*, 689 S.W.2d 408, 412 (Tex.1985); *Upjohn Co. v. Freeman*, 885 S.W.2d 538 (Tex.App.—Dallas 1994, writ denied).

8. Tex. Civ. Prac. & Rem.Code Ann. § 16.003(a) (Vernon Supp.1997).

9. 942 S.W.2d 671 (Tex.App.—El Paso 1997, no writ).

10. *See Cortes v. Maxus Exploration Co.*, 977 F.2d 195, 200 (5th Cir.1992); *Fisher v. Procter & Gamble Mfg. Co.*, 613 F.2d 527, 540 (5th Cir. 1980) (time barred acts admissible to show current conduct); *Crawford v. Western Electric*, 614 F.2d 1300, 1314 (5th Cir.1980) (time barred conduct relevant to show current discriminatory practices).

jury not to consider it for purposes of damages in this case. Having failed to do so, GTE has waived its statute of limitations argument.[11] This point of error is overruled.

GTE contends that the trial court erred in admitting the employees' expert witnesses' opinions on whether the conduct was extreme and outrageous. GTE contends (1) that the experts lacked expertise allowing them to render opinions on outrageousness, (2) that there was no basis for their giving their personal opinions, (3) that their testimony was irrelevant, and (4) that any relevance clearly was outweighed by the prejudicial effect of such opinion testimony.

A trial court's decision to admit evidence is subject to an abuse of discretion standard of review.[12] To obtain reversal of a judgment based on the admission of evidence, the appellant must show the trial court's ruling was in error and the error was reasonably calculated to cause and probably did cause the rendition of an improper judgment.[13]

Rule 702 of the Texas Rules of Civil Evidence provides that a qualified expert *may* testify as to his or her opinion or otherwise if such testimony provides scientific, technical, or other specialized knowledge that will assist the trier of fact to understand the evidence or to determine a fact in issue. Such expert testimony should be admitted only when it will aid the jury in making inferences regarding fact issues more effectively. When the jury is equally competent to form an opinion regarding an ultimate fact issue, an expert's testimony as to those issues may be excluded.[14] It is error to admit opinion evidence on an issue where no specialized or technical knowledge is necessary.[15]

In *Birchfield v. Texarkana Memorial Hospital*,[16] the Texas Supreme Court held that an expert may state an opinion on a mixed question of law and fact as long as the opinion is confined to the relevant issues and is based on proper legal concepts. We defined mixed question of law and fact in *Crum & Forster v. Monsanto*[17] to exist when a standard or measure has been fixed by law and the question is whether the person or conduct measures up to that standard. In the present case, the question of extreme and outrageous conduct was posed in a manner that would apply the mixed question of law and fact.

The *Birchfield* holding would suggest that this evidence would be admissible. On the other hand, under Rule 702, the question arises whether this conclusion would assist the trier of fact. For example, Dr. James Cleghorn, an expert witness for the defense, during cross-examination and over objection, specifically testified that he was not a lawyer, so he was going to use the definition for "outrageous conduct" that an ordinary person would use.[18] This suggested that his testimony was not based upon any experience or training that was above that possessed by the twelve jurors. Thus, in testifying in his capacity as an ordinary person, Dr. Cleghorn would do no more than serve as a thirteenth juror.

The employees introduced evidence from Dr. Shirl Brunell, a clinical psychologist with a Ph.D. in her field, concerning outrageous conduct, to which counsel duly objected. A definition of outrageous conduct was given to

11. *Soto*, 942 S.W.2d at 677.

12. *Dalworth Trucking Co. v. Bulen*, 924 S.W.2d 728, 735 (Tex.App.—Texarkana 1996, no writ).

13. Tex.R.App. P. 81(b); *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex.1989).

14. *Glasscock v. Income Property Servs., Inc.*, 888 S.W.2d 176 (Tex.App.—Houston [1st Dist.] 1994, writ dism'd by agr.); *Story Servs., Inc. v. Ramirez*, 863 S.W.2d 491 (Tex.App.—El Paso 1993, writ denied).

15. *Id.*

16. 747 S.W.2d 361, 365 (Tex.1987).

17. 887 S.W.2d 103, 134 (Tex.App.—Texarkana 1994, no writ).

18. Q You may state your opinion.

A Okay. First off, I guess the point here is that of course I'm not a lawyer, so I'm going to use your definition as an ordinary person would use the definition, and I'm going to assume with you that the worst description that I heard of the behavior actually happened, in which case I would regard it as outrageous.

the doctor and then she was asked her opinion on whether Shields had committed outrageous conduct. The following objection and testimony from direct examination of Dr. Brunell appears in the record:

And the first question I'm going to ask you is whether or not, with respect to this conduct that they reported to you of Morris Shields, whether or not in your opinion that contact was, quote, outrageous behavior, or outrageous conduct?

MR. SMITH: Your Honor, I can—if he's going to do what I think he's going to do here as to what outrageous conduct is, I just want to make this objection right now. That's outside the scope of her qualifications. She is not qualified in that respect, and we object to that, Your Honor.

THE COURT: I'm going to overrule the objection.

Q Thank you, Your Honor. And I want you to assume that outrageous conduct means the following:

"Outrageous conduct is that which goes beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community."

Do you understand . . .

MR. SMITH: Your Honor, again I would further object to it on the ground that that definition that he read is irrelevant. It's not the law; and further, I would reurge the objection that there is no showing that this lady is qualified to render an opinion on that.

THE COURT: Objection will be overruled.

Q Do you understand the definition that I just gave you?

A Yes, sir.

Q All right. With that definition in mind, and keeping in mind what these ladies told you which you've already here this afternoon told the jury about, the conduct of Morris Shields that they told you about, in your opinion was Morris Shields' conduct outrageous conduct?

MR. SMITH: And I object to that, Your Honor. She has not been qualified.

. . . .

Q In your opinion was the conduct of Morris Shields that they told you about outrageous conduct?

A Absolutely.

In the same manner, the employees elicited the opinions of Ellen Kusin, a licensed professional counselor, and on cross-examination Dr. Cleghorn, GTE's expert. Even Dr. Cleghorn concluded the described conduct was outrageous. In each instance, GTE objected to the definition and testimony.

Experts in the field of psychology are people who have studied normal and abnormal human behavior, and if any type of expert could reach a conclusion about what human conduct was outrageous, the training in psychology would probably be the best qualification. However, this testimony was inadmissible as the experts' conclusion would not assist the trier of fact because this was a decision for jurors based upon general knowledge and not expertise. Holding that the evidence was not admissible because specialized or technical knowledge was not necessary, we must decide whether admission of this evidence caused a reversible error. The Supreme Court determined in *Louder v. De Leon*[19] that "[j]urors realize that they are the final triers to decide the issues. They may accept or reject an expert's view. Thus there is little danger in an expert's answer to an all-embracing question on a mixed question of law and fact."

We must conclude that the evidence, though inadmissible, was not calculated to and did not cause the rendition of an improper verdict.

■ GTE contends that the evidence demonstrated that it lacked the required intent to have committed the tort. No corporate approval or ratification is necessary to make a corporation responsible for wrongful acts committed by an agent whose acts are regarded as the acts of the corporation itself. Those whose conduct creates direct corporate liability include corporate officers, those who have authority to employ, direct, and

19. 754 S.W.2d 148, 149 (Tex.1988).

discharge servants of the master, those engaged in the performance of nondelegable or absolute duties of the master, and those to whom a corporation has confided the management of the whole or a department or division of its business.[20] Shields, from the management level of the corporation, had authority to employ, direct, and discharge employees. He also was in charge of a department or division of the company. The company can only act through its agents, and any intent by Shields was attributable to the company. Intent for purposes of the tort of intentional infliction of emotional distress may be inferred from circumstances of cases and conduct of the actor, not just from overt expressions of intent by the actor. Although Shields may not have verbally expressed that he intended to inflict emotional distress upon the three employees, his acts of intimidation, humiliation, and belligerence on a continual basis are circumstances from which this intent could be inferred.[21]

 GTE contends that there was no finding that Shields' intentional acts were foreseeable by GTE. As stated above, Shields' actions and intent, acting in a management role, were the actions and intent of GTE. In its answers to Question 2, the jury found that Shields intentionally inflicted emotional distress on the employees. Within that question the jury was instructed on the elements of proximate cause and intent. The jury was instructed that *intentionally* "means that the actor desires to inflict severe emotional distress or knows that such distress is substantially certain to result from his conduct." Foreseeability is inherent in the finding that Shields intentionally inflicted the emotional distress. Because he was functioning on behalf of the corporation, his foreseeability was the corporation's foreseeability. The jury found that Shields was acting within the scope of his employment.

 Furthermore, GTE has not cited anywhere in its brief where objections were made or definitions were submitted to preserve this complaint to the charge. Thus, this complaint is waived.

 GTE challenges the sufficiency of the evidence supporting the damage award. GTE claims that there was (1) no evidence or insufficient evidence to support the jury's finding of damages in answer to Jury Question 6, and (2) no evidence that the medical expenses in the future were reasonable and necessary.

The jury considered damages sustained in the past and damages that in reasonable probability will be sustained in the future for physical pain, mental anguish, and reasonable and necessary medical expenses. Bruce, Davis, and Poelstra testified that at the date of trial, they had spent $500.00, $1,200.00, and $700.00, respectively, of their own funds in seeing Dr. Brunell. They also testified about their mental anguish.

The jury was instructed, among other things, that it could award damages for reasonable and necessary medical expenses. In another instruction, the jury was instructed that it could award damages that were sustained in the past and in reasonable probability would be sustained in the future. Dr. Shirl Brunel testified that the future damages would probably be "about $10,000" for all three employees.

The award on damages lumped together all damages, past and future, future pain and mental anguish, and reasonable and necessary medical expenses. Any attempt by this Court to calculate how much of the lump sum verdict was for future medical would be purely speculative. We are not in the position to review the amount of damages that might have been included for future medical expenses.[22]

---

20. *Fort Worth Elevators Co. v. Russell*, 123 Tex. 128, 70 S.W.2d 397, 406 (1934), *overruled on other grounds*, 725 S.W.2d 712 (Tex.1987); *Treasure City v. Strange*, 620 S.W.2d 811, 814 (Tex. Civ.App.—Dallas 1981, no writ).

21. *Behringer v. Behringer*, 884 S.W.2d 839 (Tex. App.—Fort Worth 1994, writ denied).

22. *Clark Equip. Co. v. Pitner*, 923 S.W.2d 117 (Tex.App.—Houston [14th Dist.] 1996, writ denied); *see also K Mart Corp. v. Rhyne*, 932 S.W.2d 140, 147 (Tex.App.—Texarkana 1996, no writ).

The record shows sufficient evidence for the jury's damage award. We overrule these points.

To frame the overarching issue in this case, from the employees' point of view, their question would be "Should workers be required to tolerate the kind of conduct that they have alleged and the jury has found?" To this, the workers would answer "No." From the employers' point of view, the issue might be framed: "Should the courts attempt to give damages for all disagreeable conduct of supervisors that employees have suffered during their employment?" To this, the employers answer "No" on the basis that it would be improper and impossible for the courts to attempt to supervise all such conduct. But the legal issue is more difficult. In everyday terms, it might be simply phrased: "Did the supervisor cross the line?" This refers to the unseen boundary of conduct which cannot be tolerated by society. In legal terminology, the question is whether the supervisor's conduct was extreme and outrageous.

This issue has been brought to this Court in terms of a challenge of the legal and factual sufficiency of the evidence, which constitutes the essential elements of intentional infliction of emotional distress.

In reviewing evidence for legal and factual sufficiency, we first must examine the record for any probative evidence to support the finding and ignore all contrary evidence.[23] If we find some probative evidence to support the finding, then we test the factual sufficiency by examining the entire record to determine whether the finding is clearly wrong and unjust.[24]

If a party raises a matter of law challenge on an adverse finding, we first examine the record for evidence supporting the finding and ignore evidence to the contrary.[25] Second, if no evidence supports the finding, we examine the entire record to determine whether the challenger established the contrary position as a matter of law.[26] If so, we will sustain the point of error.[27]

If an appellant raises both "no evidence" and "insufficient evidence" points, we first rule on the "no evidence" point.[28]

In reviewing a "no evidence" point, we view the evidence in the light most favorable to the finding, consider only evidence supporting the finding, indulge all reasonable inferences therefrom, and disregard all contrary or conflicting evidence and inferences.[29] We will sustain a "no evidence" point only if the record contains no more than a scintilla of evidence to support the trial court's finding.[30] In reviewing an "insufficient evidence" point, we consider and weigh all the evidence.[31]

The elements of intentional infliction of emotional distress are that (1) the defendant acted intentionally or recklessly, and (2) the defendant's conduct was extreme and outrageous (3) and caused plaintiff emotional distress, (4) which was severe.[32]

■■■ GTE contends that there was no evidence or insufficient evidence supporting the finding of extreme and outrageous conduct.[33] In an intentional infliction of emotional distress cause of action, the conduct

**23.** *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex. 1965).

**24.** *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951).

**25.** *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989).

**26.** *Id.*

**27.** *Meyerland Community Improvement Ass'n v. Temple,* 700 S.W.2d 263, 267 (Tex.App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.).

**28.** *Glover v. Texas Gen. Indem. Co.,* 619 S.W.2d 400, 401 (Tex.1981).

**29.** *Weirich v. Weirich,* 833 S.W.2d 942, 945 (Tex. 1992).

**30.** *Freeman v. Texas Compensation Ins. Co.,* 603 S.W.2d 186, 191 (Tex.1980).

**31.** *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660.

**32.** *Mattix–Hill v. Reck,* 923 S.W.2d 596 (Tex. 1996).

**33.** Point of error eight challenges the finding "as a matter of law," but as discussed previously, this is a "no evidence" challenge because GTE did not have the burden of proof on this issue.

must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." [34] Insensitive or rude behavior does not amount to outrageous behavior.[35] Petty bickering, insults, and indignities are not recognized as outrageous conduct.[36]

In the employer-employee context, Texas courts have determined very few incidents to constitute extreme and outrageous conduct.[37] To be outrageous in the employment setting, the complaints must be more than mere employment disputes.[38] Ordinary employment disputes do not rise to the level of extreme and outrageous behavior because to properly manage its business, an employer must be able to supervise, review, criticize, demote, transfer, and discipline its employees.[39] Even if a private employer's practices are objectionable, that does not render the employer liable for intentional infliction of emotional distress.[40]

The Texas Supreme Court in *Twyman v. Twyman* [41] initially set out the elements for intentional infliction of emotional distress. Before *Twyman*, several Texas courts held that in employee-employer contexts, intentional infliction of emotional distress occurred when an employee was subjected to repeated or ongoing harassment, including humiliating remarks.[42] While each incident, comment, or confrontation taken separately might not be outrageous conduct, "when taken together and considered in context and the appropriate time frames," the incidents can constitute outrageous conduct.[43]

Complaints against Shields were not that of sexual harassment. There were complaints from all three employees that Shields had on occasion threatened to terminate their employment. On one occasion, he threatened to do so if they did not straighten up the office. On another occasion, he told another employee that they could be replaced by two Kelly girls that were twenty years old. One of the employees testified that Shields threatened to fire her and send her back to her old job.

While this conduct may reflect poor management skills and a negative motivational tool, an employer in an at-will employment situation has a right to discharge an employee with or without cause, and it is not outrageous conduct to so inform the employee.

The workers also testified that they were required to do work that they did not consider a part of their job responsibilities. Bruce testified that she was required to purchase a vacuum cleaner from money in the petty cash box and then required to vacuum her office even though there were cleaning people on contract to clean the office after hours, that other employees laughed at her for vacuuming, that the vacuuming interfered with the routine work like telephone calls, and that another employee, Jodie Adcock, was required to use spot cleaner and a rag to keep spots off of the carpet. Poelstra testified that she had to clean tobacco spit off the

---

**34.** *Natividad v. Alexsis, Inc.*, 875 S.W.2d 695, 699 (Tex.1994).

**35.** *Id.*

**36.** *Wornick Co. v. Casas*, 856 S.W.2d 732 (Tex. 1993).

**37.** *Horton*, 827 S.W.2d at 369.

**38.** *Miller v. Galveston/Houston Diocese*, 911 S.W.2d 897, 899 (Tex.App.—Amarillo 1995, no writ).

**39.** *MacArthur v. University of Texas Health Ctr.*, 45 F.3d 890, 898 (5th Cir.1995); *Johnson v. Merrell Dow Pharmaceuticals*, 965 F.2d 31, 33 (5th Cir.1992) (applying Texas law).

**40.** *Miller*, 911 S.W.2d at 901.

**41.** 855 S.W.2d 619 (Tex.1993).

**42.** *Bushell v. Dean*, 781 S.W.2d 652, 657–58 (Tex.App.—Austin 1989), *rev'd in part on other grounds*, 803 S.W.2d 711 (Tex.1991) (involving harangues, threats, and yelled verbal assaults); *American Medical Int'l v. Giurintano*, 821 S.W.2d 331, 340–42 (Tex.App.—Houston [14th Dist.] 1991, no writ) (involving a number of false rumors and ugly, uncomplimentary remarks made to and about the employee by some of his co-employees); *Havens v. Tomball Community Hosp.*, 793 S.W.2d 690, 691–92 (Tex.App.—Houston [1st Dist.] 1990, writ denied) (involving vulgar jokes, lewd and suggestive remarks, and angrily shouted statements).

**43.** *Giurintano*, 821 S.W.2d at 342.

wall, and Davis testified that she had to clean spots off the rug.

We have not been cited to any job description for these employees or any contract that would specify their duties. If the union contract had a provision limiting the functions of employees, it was not pointed out to this Court, nor was it introduced into evidence, nor did the union take action on a contract violation. Although many would think these jobs degrading, a job assignment that is legal and not violative of a contract, policy, or job description cannot be considered behavior that would amount to intentional infliction of emotional harm.

Davis testified that Shields would often go into a rage and charge an employee. "Charging" was explained by a number of employees to mean that Shields would run at an employee, hands down, head bent, lunging forward, would get uncomfortably close to the employee's face and would yell.

Bruce testified that Shields screamed in her face on several occasions and was always in a rage. She stated that she could not sleep at night after observing him yelling at another employee. She testified about him beating a banana with his fist and that she thought he was going to hit her. She also testified that on one occasion Shields yelled and screamed because a person's umbrella had been left on her desk.

Poelstra testified that Shields got angry and frightened her. She stated that he made her wear a post-it note on her shirt that said, "Don't forget your paperwork."

There was different testimony from the employees about a videotape that Shields showed to the employees. Rhonda Bruce testified that while showing a training film, Shields put in another tape and said, "There is something you can watch." She testified that she heard a comedian coming on television and what made her look was that the comedian was talking about women's breasts and breast milk. She says that she glanced

and remembered that Shields was standing there watching the video and laughing, and that her thought was, "Filth. Get your stuff and get out of here. Filth is playing here; get out."

Poelstra testified that she was not present at the movie and that Bruce was not there either. Davis testified that Shields was playing a comedy on the television and saw a bare-breasted woman. She testified that when Shields saw what was coming on, he shouted, "Oh, Granny," that he jumped up and got in front of her so that his body blocked the television, and then turned it off. She testified that she believed the characters on the television screen were about to engage in sexual intercourse.

Many of the complaints involved the use of inappropriate language. It was admitted that there was generally an atmosphere of dirty jokes on the job, and the testimony suggested that this language was not unique to Shields.[44] Some of Shields' language that was complained about was when he was involved in telephone conversations with a third party.[45] The courts cannot undertake to make all work places free from offensive language by giving monetary awards to those who may be offended.

Bruce testified that Shields used curse words on a daily basis, including the term "goddamn," that he sometimes used curse words directly at her, that she complained about his use of language, and that he responded by saying, "This is my department. I will do and say any damn thing I want, and I don't give a shit who likes it." She also testified that he showed the employees material with bad words and pictures and that she felt degraded. Bruce also testified that Shields had shown her an offensive cartoon.

Poelstra testified that Shields had yelled, "Bull shit." She admitted that he had entered into an agreement to stop using profanity.

---

44. Linda Davis testified that she and Joyce Poelstra and others around the facility had cursed from time to time. Joyce Poelstra testified that there was an atmosphere of dirty language on that job.

45. Linda Davis testified that she heard Shields cursing people over the phone and that the foul language occurred mostly over the telephone when talking to males.

Davis testified that Shields told a sexual joke, and that he used the word "motherfucker."

In the recent case of *Soto v. El Paso Natural Gas Co,*[46] the El Paso Court of Appeals reversed a summary judgment decision against an employee, finding among other things, that there was sufficient evidence to create a fact issue on intentional infliction of emotional distress because of the supervisor's ridicule of the employee's breast cancer surgery, his remarks about her being "lopsided" and having "a plastic boob," and his touching her at the site of her cancer surgery. The court determined that a reasonable fact finder could easily conclude this action to be atrocious and outrageous, and the court stated that it could discern no purpose for such statements, except to deeply wound the employee.[47]

It is not enough that the defendant has acted with an intent that is tortious or even criminal.[48] Whether the conduct may reasonably be regarded as extreme and outrageous so as to permit recovery is initially a question of law for the courts.

After reading the Texas cases on the subject of intentional infliction of emotional distress, there may be a desire to cry out for more guidance. *Twyman*, which is the lead Texas Supreme Court case on the subject, is a series of concurring and dissenting opinions, but does not establish any easy standards for predicting when human conduct may be determined to be extreme and outrageous. In Justice Nathan Hecht's concurrence and dissent, he opines that the vice and nebulous standard of outrageousness will result in erratic decisions that appear to have no unifying principle. He further laments that jurors are not only permitted to judge a defendant's conduct by their own personal experiences; they are required to do so. This is an accurate assessment, but we have operated on this same principle with the tort

of negligence for a long time. Even though the shelves of law books are filled with a myriad of cases and the CD Roms are crammed with millions of words, there is not likely to be a fact situation exactly on point in any given case alleging the tort of intentional infliction of emotional distress. When dealing with human conduct, the situations that may arise are far in excess of the possible sequences of the chess game or the stars in a clear night sky. Our case law is filled with an infinite variety of fact situations.

It is difficult to imagine a workable list of principles that would provide a bright line between tolerable conduct and outrageous conduct. One reason is the constant change in what is considered acceptable conduct in society. As Justice Oliver Wendell Holmes declared, "A word is not a crystal, transparent and unchanging, it is the skin of a living thought and may vary greatly in color and content *according to the circumstances and the time in which it is used*" (emphasis added).

In *Twyman*, Justice Hecht quoted Prosser's statement: "There is a difference between violent and vile profanity addressed to a lady, and the same language to a Butte miner and a United States marine." [49] When Prosser expressed that idea in 1939, it no doubt had some accuracy, but in our times the Butte miner or the United States marine may be a lady.

Mutuality in the language between people may establish the level of usage, or an objection by one of the parties to such language can also be a part of establishing what is acceptable between those parties. In the present case, Bruce testified that she had told Shields that she did not appreciate dirty jokes, cussing, or anything of a sexual nature in the office. Davis testified that she told Shields that she did not want any sexual stuff, and he agreed the office would be run professionally.

---

46. 942 S.W.2d 671.

47. In *Jones v. Harris,* 35 Md.App. 556, 371 A.2d 1104 (1977), the Court of Special Appeals of Maryland held that when a supervisor mimic the employee's stutter and speech pattern, the employee's resulting nervousness and irritation was

insufficient to show the severity of emotional distress needed to permit recovery.

48. *Washington v. Knight,* 887 S.W.2d 211, 216 (Tex.App.—Texarkana 1994, writ denied).

49. *Twyman,* 855 S.W.2d at 639.

When dealing with different relationships, such as employer-employee, teacher-student, husband-wife, doctor-patient, stranger-stranger, and so forth, the rules may vary because of other relationships between the parties. It would place an impossible burden upon the courts to review every employee's disciplinary action or threatened disciplined situation to determine if the type of discipline was appropriate for the conduct involved and to determine if the reaction of the employer was properly invoked by the conduct of the employee. One complaint in the present case was that Shields asked one of the litigants a question during a training session when Shields knew that she did not know the answer. This is not an uncommon teaching practice to demonstrate that employees or students have not learned some knowledge required for the job or the course. If this is an actionable tort, one would suspect that all law professors and most other teachers would be subjected to continuous litigation. And while it is unfortunate that the person may be embarrassed, this does not constitute a legal wrong.

Examining the overall behavior of Shields, we must look at the complaints of the employees, namely that Shields went into rages, charged the employees, got in their faces, and cursed them. This type of conduct can be observed in the fall of the year by football coaches discussing mistakes with their players in front of crowded stadiums or in a boot camp of a military organization, but it is not a common practice in the civilian workplace. Employees do not contend that an isolated incident of this nature constituted a tort, but they contend that the continuous conduct by Shields made it outrageous.

The testimony clearly showed that Shields was intentionally intimidating, humiliating, frightening, and embarrassing the employees. Linda Davis described his conduct as making her feel "like a puddle of water." This evidence was legally sufficient to support the jury's determination that there was evidence to support the finding of outrageous conduct.

Shields' defense was primarily a denial of the allegations of his conduct. The jury is the decider of fact in such disputed testimony and found against Shields and GTE on this issue. We find that there was factually sufficient evidence to support the jury's finding.

The judgment of the trial court is affirmed.