**COASTAL CHEM, INC., Appellant,**

v.

**John BROWN, a Division of Trafalgar House, Inc., and Davy McKee Corporation, now known as Kvaerner John Brown, a Division of Kvaerner U.S., Inc., Appellees.**

No. 14–99–00045–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Nov. 16, 2000.

Rehearing Overruled Jan. 18, 2001.

Andrew Wooley, James Andrew Freeman, Everard A. Marseglia, Houston, for appellants.

Richard W. Avery, Louis B. Paine, Sandra S. Hall, Houston, for appellees.

Panel consists of Justices MAURICE E. AMIDEI, ANDERSON, and FROST.

## OPINION

MAURICE E. AMIDEI, Justice.

Coastal Chem, Inc. ("Coastal") appeals the judgment entered in favor of John Brown, a Division of Trafalgar House, Inc., and Davy McKee Corporation, now known as Kvaerner John Brown, a Division of Kvaerner U.S., Inc. (collectively, "John Brown"), in an action for breach of a construction contract. We affirm.

### I. FACTUAL BACKGROUND

In 1990, Coastal and John Brown[1] entered into a contract for the construction of a Methyl Tertiary Butyl Ether ("MTBE") plant for Coastal in Cheyenne, Wyoming. The contract consists of two parts. The first is the Master Contract under which John Brown agreed to provide services for engineering, design, procurement, construction of, and start-up assistance with, designated Coastal projects and operations. The second is the Assignment, which provided for the design, engineering, and construction of the MTBE plant.

The contract provides that John Brown would be entitled to an early-completion bonus if the plant were substantially complete eighteen months from August 27, 1990. On that early-completion target date (February 29, 1992), Coastal accepted the plant as substantially complete. After Coastal's acceptance, several problems arose with the plant. Coastal claims these problems prevented the plant from being substantially complete on February 29, 1992. Instead, Coastal claims, the plant was substantially complete on January 6, 1993. The early-completion bonus, if earned, was payable when the plant was finally complete, an event which Coastal stipulated occurred on November 15, 1993.

Coastal refused to pay John Brown the early-completion bonus.

John Brown sued Coastal for breach of the construction contract for failure to pay (1) the early-completion bonus and (2) amounts owed for removing and replacing two boilers as change or extra work under the contract. John Brown also brought a claim for the breach of a second contract to share in insurance proceeds Coastal sought in connection with the repair of the plant's steam active reforming technology ("STAR") unit, which sustained damage in an attempted start-up of the plant. John Brown further asserted a claim for quantum meruit for services provided outside the scope of the contract in connection with the STAR unit. Coastal brought a counterclaim, asserting that John Brown failed to complete construction of the plant on time and, therefore, Coastal was entitled to a delay penalty under the contract. Coastal sought other damages for John Brown's failure to complete certain assigned work and for Coastal's costs of having to replace the two boilers.

Before trial, Coastal admitted to owing John Brown $1.3 million in insurance proceeds for the repair of the STAR unit received from the settlement of a lawsuit Coastal brought against the insurance carriers. Coastal and John Brown stipulated to, depending on the jury's finding on the substantial completion date, a maximum bonus of $4,301,890 and a maximum penalty of $2,150,945.

The jury found that: (1) the plant was substantially complete on February 29, 1992; (2) the work John Brown performed on the boilers was change or extra work; (3) John Brown performed $2,004,173 in compensable work outside the scope of the contract on the STAR unit; (4) John Brown and Coastal agreed that John Brown would be reimbursed $1.3 million in insurance proceeds for John Brown's work

---

1. Davy McKee Corporation signed the contract. John Brown succeeded to the interests of Davy McKee.

on the STAR unit; and (5) John Brown failed to comply with the contract with respect to various components of assigned work.

The trial court entered final judgment in favor of John Brown in the amount of $4,301,890 as an early-completion bonus, $1,914,648 as extra work under the contract, and $2,004,173 as work performed outside the scope of the contract, plus prejudgment interest. The trial court also entered final judgment in favor of Coastal in the amount of $697,492 for John Brown's failure to complete certain assigned work under the contract, plus prejudgment interest. Coastal's award was to be credited against John Brown's $1,914,648 recovery for extra work.

## II. ANALYSIS OF ISSUES PRESENTED

### A. Date of Substantial Completion

■ In its first issue, Coastal contends there is no evidence to support the jury's finding that the plant was substantially complete as of February 29, 1992. When reviewing the legal sufficiency of the evidence, we consider only the evidence and inferences tending to support the trial court's finding, and disregard all contrary evidence and inferences. *See Southwestern Bell Mobile Sys. v. Franco*, 971 S.W.2d 52, 54 (Tex.1998) (per curiam). We will sustain a no evidence point if there is no more than a scintilla of evidence to support the finding. *See General Motors Corp. v. Sanchez*, 997 S.W.2d 584, 588 (Tex.1999).

■ Coastal also claims that the evidence establishes as matter of law that the plant was not substantially complete until January 6, 1993. In addressing this issue, we must first examine the record for evidence supporting the jury's finding, while ignoring all evidence to the contrary. *See Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex.1989). Then, if there is no evidence to support the fact finder's answer, we examine the entire record to determine if the contrary proposition is established as a matter of law. *See id.*

### 1. Meaning of "Substantially Complete" Under the Contract

■ Coastal contends "substantially complete" means that the plant actually had to function and be ready for safe start-up. John Brown, on the other hand, claims that "substantially complete" required only successful installation, not a fully-operational plant.

■ When construing a contract, we must give effect to the true intentions of the parties as expressed in the written instrument. *See Lenape Resources Corp. v. Tennessee Gas Pipeline Co.*, 925 S.W.2d 565, 574 (Tex.1996). We must read the contract as a whole, rather than by isolating a certain phrase, sentence, or section of the contract. *See State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex. 1995). We are to give the language of the parties' agreement its plain grammatical meaning unless doing so would defeat the parties' intent. *See DeWitt County Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 101 (Tex.1999).

With respect to substantial completion, Article 2.19 of Exhibit D to the Assignment states:

> "SUBSTANTIALLY COMPLETE" shall mean that all ASSIGNED WORK has been completed consistent with the ASSIGNMENT DOCUMENTS, including Exhibit A.5, excluding only PUNCH LIST ITEMS.

Attachment A.5 to Exhibit A of the Assignment further provides:

> b. *Prepared for Start-up.* The date when the Plant is *"Substantially Complete" (or mechanically complete or ready for commissioning, i.e., initial operation) occurs when the plant, unit or facility has been erected in accordance with the Contract and applicable codes and all work necessary for safe start-up has been completed,* excluding non-essential punch list work such as

painting, insulation and incidental construction, and pre-commissioning activities have been completed by [JOHN BROWN] as detailed in Sections 3 and 4.

c. *Start-up.* Basically, start-up (or commissioning, i.e., initial operation) activities are associated with the actual running or operating of the plant and are OWNERS [sic] responsibilities unless specifically directed otherwise by the CONTRACT.

Start up by OWNER follows mechanical completion of pre-commissioning activities performed by [JOHN BROWN]. During start-up, OWNER makes operating adjustments required before the plant may be satisfactorily operated, and immediately commences operation of the plant, performing any further adjustments, settings, etc., that may be required for downstream performance testing.

(Emphasis added).

A plain reading of the contract leads to the conclusion that "substantially complete" means an erected structure, with all work necessary for safe start up completed. It does not mean an operating plant. The contract specifically provides for pre-commissioning activities to take place after substantial completion, but prior to start-up of the plant. Precommissioning activities are the "non-operating adjustments and cold alignment checks" conducted by John Brown. The contract specifically provides that, following substantial completion, Coastal is responsible for start-up activities of the plant, which are "associated with the actual running or operating of the plant," unless provided otherwise. The contract provides that John Brown's responsibility in connection with the start-up activities was to coordinate and advise plant start-up from substantial completion to final completion, resolve plant and equipment design or operation problems, and assist Coastal in obtaining warranted performance of plant equipment.

Article 6.3 of the Master Contract, which sets forth the procedure by which John Brown was to notify Coastal of substantial completion, states:

When [JOHN BROWN] considers that a TASK, or separable portion thereof, is SUBSTANTIALLY COMPLETE, [JOHN BROWN] may so inform OWNER in writing, and such TASK or portion shall be considered SUBSTANTIALLY COMPLETE unless within the following five (5) business DAYS OWNER notifies [JOHN BROWN] in writing in reasonable detail of the valid reasons why such TASK or portion is not SUBSTANTIALLY COMPLETE, upon which [JOHN BROWN] shall remedy such matters in accordance with the ASSIGNMENT and this CONTRACT and the above procedure shall be repeated. If OWNER agrees that a TASK or portion is SUBSTANTIALLY COMPLETE as of the time [JOHN BROWN] first gave such notice to OWNER, the effective date thereof shall be deemed to be the date on which [JOHN BROWN] first gave notice to OWNER that the TASK or portion was SUBSTANTIALLY COMPLETE. OWNER shall be deemed to have accepted the risk of loss and the responsibility for the care, custody, control and maintenance of the TASK or portion when it is SUBSTANTIALLY COMPLETE.

Upon achieving substantial completion of any part of the plant, John Brown was to notify Coastal in writing. If Coastal did not respond within five business days with valid objections to John's Brown's notification, then the task would be considered substantially complete. If Coastal agreed that a task or portion was substantially complete, then the effective date of substantial completion was the date on which John Brown first gave written notice to Coastal.

### 2. *Latent Defects*

Coastal asserts that any acceptances of John Brown's work do not override the

requirement for a fully-operational plant. Coastal claims that it was asked to accept the plant as substantially complete on February 29, 1992, when it was not possible to know that latent defects prevented the plant from being substantially complete on that date. In support of this argument, Coastal relies on Article 7.1 of Exhibit D to the Assignment, which states:

> *[JOHN BROWN's] Continuing Responsibility.* Neither the inspection, approval or payment, including final payment, under the ASSIGNMENT DOCUMENTS shall be construed to be an acceptance of defective material or workmanship or shall be an admission of [JOHN BROWN's] satisfactory performance of the ASSIGNED WORK and shall not relieve [JOHN BROWN] of any of its obligations under the ASSIGNMENT DOCUMENTS.

Coastal further relies on the documents John Brown tendered to Coastal in connection with obtaining Coastal's acceptance of John's Brown's notice of substantial completion. These documents plainly state "this turnover document does not relieve either party of any agreement or responsibilities outlined in the contract or attachments to the contract." The contract further provides: "[T]he failure of either party to insist upon the other party's compliance with its obligations under this Contract in any one or more instances shall not operate to relieve such other party from its duty to comply with such obligation in all other instances."

Article. 7.1 of the Master Contract provides for John Brown's warranty obligation to Coastal for its work performed in the design and construction of the plant:

> ... [JOHN BROWN] warrants all design, engineering and construction work performed by [JOHN BROWN] against defects in design and workmanship for a period of twelve (12) months after a particular ASSIGNMENT is FINALLY COMPLETE in accordance with ARTICLE 6.3 ("WARRANTY PERIOD"); however, to the extent an ASSIGN-MENT comprises construction, the WARRANTY PERIOD shall be either eighteen (18) months after installation of the work or twelve (12) months after OWNER has accepted the responsibility for the care, custody, control and maintenance of the TASK or portion thereof in accordance with ARTICLE 6.3, whichever period expires first.

■ While Coastal is correct that its acceptance of substantial completion did not relieve John Brown of its obligation to comply with all provisions of the contract, Coastal's assertion that the existence of any latent defects, not discovered until after the acceptance of substantial completion, vitiates substantial completion is incorrect. Once Coastal accepted John Brown's work as substantially complete, any claims of defective workmanship did not invalidate the achievement of substantial completion. Instead, Coastal's remedy for any defective workmanship was in John Brown's continuing obligations under the warranty provision. The warranty period commenced upon installation or when the owner accepted responsibility for the care, custody, control, and maintenance, i.e., substantial completion or mechanical completion of the plant or portion thereof.

Furthermore, final completion occurs, in part, after John Brown's completion of "pre-commissioning work and correction of items discovered after mechanical completion." Therefore, by the terms of the contract, any warranty work necessarily would arise after substantial completion. Consequently, work performed under the warranty for defective items found after substantial completion might delay final completion, but it does not vitiate substantial completion.

### 3. *Failure to Perform Assigned Work*

■ The jury found that John Brown had failed to comply with the agreement in certain respects. Specifically, in response to Question No. 11, the jury found that John Brown had failed to complete twelve

components of work assigned by Coastal. Coastal contends that John Brown's failure to finish this work prevented substantial completion on February 29, 1992. However, the items the jury found in answer to Question No. 11 consisted entirely of warranty obligations. The existence of items that constitute warranty work would not affect the achievement of substantial completion. Substantial completion is a one-time event. John Brown's Article 7.1 warranty obligations did not commence until substantial completion. The fact that John Brown failed to perform warranty work does not undo substantial completion.

### 4. *Defective Boilers*

Coastal also argues that the installation of two defective boilers prevented substantial completion on February 29, 1992. The plant required boilers to produce the steam, which, in turn, was necessary to produce the MTBE. Under the contract, John Brown was to share in the cost savings resulting from the utilization of used equipment in the design and construction of the MTBE plant. Coastal located two used boilers for installation in the plant. John Brown inspected and acquired those boilers on behalf of Coastal. At some point after February 29, 1992 (the date of substantial completion), it was determined that the used boilers were operating below specification levels. Consequently, the boilers had to be removed and new boilers had to be installed in their place.

 Under the contract, John Brown's duties with respect to the boilers were to erect them in accordance with all applicable engineering standards and government codes, make non-operating pressure tests in accordance with applicable codes, inspect the installation of the boilers, and make non-operating pre-firing tests. Coastal acknowledged that John Brown had completed these duties. Thus, at that point in time, John Brown's sole responsibility under the contract with respect to the defective boilers was to pass through any vendor warranties and assist Coastal

in enforcing those warranties. Article 7.2 of the Master Contract provides:

[JOHN BROWN] assumes no responsibility or liability for any materials or equipment, whether new or used, furnished by OWNER for incorporation into the work. As part of [JOHN BROWN's] procurement services, [JOHN BROWN] shall secure, for the benefit of OWNER, available warranties of third party vendors and suppliers running directly to OWNER or assignable by [JOHN BROWN] to OWNER, with respect to the materials, equipment and work performed or furnished by such vendors and suppliers, warranting against defects in workmanship, design and material. . . . [JOHN BROWN's] liability regarding such materials, equipment and work shall be limited to using all reasonable efforts, short of litigation, to enforce third party warranties on behalf of OWNER until the TASK is FINALLY COMPLETE pursuant to Article 6.3 hereof.

Coastal, however, contends that Article 7.2 cannot create substantial completion if the plant was not, in fact, substantially complete. With respect to equipment such as the boilers, John Brown's only contractual obligation after Coastal's acceptance of substantial completion was enforcement of the vendor warranties "short of litigation." Article 7.2 states that such warranty enforcement efforts are to take place until the task is finally complete; therefore, such efforts will necessarily take place after substantial completion, and the enforcement of the vendor warranty on the boilers does not override substantial completion.

### 5. *Admission of Expert Testimony*

Also in its first issue, Coastal complains that the trial court erred in allowing John Brown's expert witness, Gary Markham, to testify about the safe start-up of the plant without properly functioning boilers because such testimony was not the proper subject for expert testimony. The admis-

sion or exclusion of evidence rests within the sound discretion of the trial court. *See City of Brownsville v. Alvarado,* 897 S.W.2d 750, 753 (Tex.1995). To obtain reversal of a judgment based upon error in the admission or exclusion of evidence, the appellant must show that: (1) the trial court did, in fact, commit error, and (2) the error was reasonably calculated to cause, and probably did cause, the rendition of an improper judgment. *See Gee v. Liberty Mut. Fire Ins. Co.,* 765 S.W.2d 394, 396 (Tex.1989).

Rule 702 of the Texas Rules of Evidence permits a witness qualified as an expert by knowledge, skill, experience, training, or education to testify on scientific, technical, or other specialized subjects if the testimony would assist the trier of fact in understanding the evidence or in determining a fact issue. *See* TEX.R.EVID. 702; *Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 718 (Tex.1998). It is error, however, to admit expert testimony on an issue if no specialized or technical knowledge is necessary. *See GTE Southwest, Inc. v. Bruce,* 956 S.W.2d 636, 640 (Tex.App.—Texarkana 1997), *aff'd,* 998 S.W.2d 605 (Tex.1999); *Story Servs., Inc. v. Ramirez,* 863 S.W.2d 491, 499 (Tex. App.—El Paso 1993, writ denied). The erroneous admission of expert testimony, however, may amount to no more than harmless error. *See GTE Southwest, Inc. v. Bruce,* 998 S.W.2d 605, 620 (Tex.1999).

Coastal, in its Amended Motion in Limine, informed the trial court that both parties had retained experts to "opine on certain ultimate issues," but that "[u]pon reflection, however, it is apparent that none of the issues upon which the experts are opining are the proper subject for expert testimony." John Brown, in its Second Amended Motion in Limine, moved to exclude the testimony of Coastal's expert on the basis that Coastal had conceded that the none of the issues on which Coastal's expert was to opine were the proper subject for expert testimony. At a pretrial hearing, John Brown argued that it had designated Markham to testify about John Brown's compliance with the standard of care for the engineering profession in connection with its work on the plant. The trial court denied both motions in limine, but instructed the parties to inform the court when the experts would be called. When John Brown called Markham to testify, Coastal reminded the trial court of Coastal's objection to Markham.

Coastal now complains about the following testimony by Markham:

> Okay. I guess my opinion is that Coastal located these boilers, they bought them, they put money down on them. They represented to John Brown that that was what they wanted in the way of the boilers and that they would be refurbished to their satisfaction to meet the requirement of the project and John Brown's spec. They then coerced— someone coerced John Brown to accept the assignment of the purchase of these boilers and continue paying for them.

Coastal objected to this testimony. The trial court sustained the objection, and reminded John Brown that Markham was not permitted to testify so as to bolster the facts of the case, but that Markham could give opinions of an expert nature. The trial court instructed the jury to disregard that testimony.

Coastal also complains of Markham's subsequent testimony:

> The reason they didn't start up after substantial performance was that—they were attempted to start-up, and it was determined that there were latent defects in the boilers supplied by Midwest Steel and work done by Southern Mechanical. These were hidden defects that were not discovered by John Brown nor by Coastal nor by third-party inspectors hired by Coastal.

In addition, Coastal complains that Markham was allowed to testify about when substantial completion occurred, the scope of the warranties covering the boilers, and

Coastal's intent in utilizing used equipment as provided in the contract. Coastal, however, did not object to any of this testimony at the time it was presented. Coastal's failure to object to Markham's testimony waives any error on appellate review. *See* Tex.R.App.P. 33.1.

Even if Coastal had not waived any error, the admission of this evidence would not provide grounds for reversal. The complained of testimony is merely cumulative of the testimony of Bill Godley, John Brown's Project Director for the construction of the MTBE plant. The erroneous admission of evidence that is merely cumulative and does not concern a material issue dispositive of the case is harmless error. *See GTE Southwest, Inc.*, 998 S.W.2d at 620; *McInnes v. Yamaha Motor Corp. U.S.A.*, 673 S.W.2d 185, 188 (Tex. 1984). Moreover, as previously determined, the installation of the used boilers did not invalidate substantial completion of the plant because this equipment fell within the Article 7.2 warranty. Coastal's first issue is overruled.

## B. Uncompleted Assigned Work and Warranty Obligations

In its second issue, Coastal contends the jury's finding that substantial completion occurred on February 29, 1992, was rendered immaterial by the jury's finding that John Brown failed to complete certain components of the assigned work. A jury finding is immaterial only if the question should not have been submitted to the jury or if the question, even though properly submitted, was rendered immaterial by other findings. *See Salinas v. Rafati*, 948 S.W.2d 286, 288 (Tex.1997). As noted in our discussion of the first issue, the items the jury found to be uncompleted assigned work are subject to John Brown's warranty, which commenced at substantial completion, and do not affect the date of substantial completion. Therefore, the jury's finding on substantial completion was not rendered immaterial by its finding on un-

completed assigned work. Coastal's second issue is overruled.

In its third issue, Coastal claims the jury's finding that the plant was substantially complete on February 29, 1992, fatally and irreconcilably conflicts with the jury's finding that John Brown failed to complete the assigned work. Jury answers are in fatal conflict if one of the answers claimed to be in conflict would require a judgment in favor of the plaintiff, and the other answer would require a judgment in favor of the defendant. *See Lee v. Huntsville Livestock Servs., Inc.*, 934 S.W.2d 158, 160 (Tex.App.—Houston [14th Dist.] 1996, no writ) (citing *Little Rock Furniture Mfg. Co. v. Dunn*, 148 Tex. 197, 222 S.W.2d 985, 991 (1949)). Coastal, however, failed to preserve error on this issue when it failed to object to the purported conflict before the jury was discharged. *See City of Port Isabel v. Shiba*, 976 S.W.2d 856, 860 (Tex.App.—Corpus Christi 1998, pet. denied); *Torres v. Caterpillar, Inc.*, 928 S.W.2d 233, 244 (Tex. App.—San Antonio 1996, writ denied); *Ciba–Geigy Corp. v. Stephens*, 871 S.W.2d 317, 324 (Tex.App.—Eastland 1994, writ denied); *see also* Tex.R.Civ.P. 295 (providing that when jury answers are in conflict, the trial court, in writing, shall instruct the jury in open court of the nature of the conflict, provide the jury with such additional instructions as may be proper, and retire the jury for further deliberations). Even if Coastal had not waived error, there could be no finding that the answers are in conflict because the items the jury found to be uncompleted assigned work were subject to John Brown's warranty and, therefore, did not override substantial completion on February 29, 1992. Coastal's third issue is overruled.

## C. Insurance Proceeds

In its fourth issue, Coastal contends the jury's finding that the plant was substantially complete on February 29, 1992, is rendered immaterial by the jury's finding that John Brown was entitled to be reim-

bursed from the insurance proceeds. On July 24, 1992, during an attempted start-up of the plant, the STAR unit sustained substantial physical damage, the cause of which was not determined. John Brown agreed to perform repairs to the STAR unit. With John Brown's assistance, Coastal submitted a proof of loss with respect to the STAR unit to Coastal's insurance carrier. This proof of loss included John Brown's costs of approximately $2 million, at that time. When Coastal's carrier refused the claim, Coastal sued the carrier. Coastal and its carrier settled the lawsuit for $15 million. Coastal, however, refused to pay John Brown its share of the insurance settlement. Coastal initially denied the existence of any agreement with John Brown to divide the insurance proceeds, but prior to trial, Coastal admitted that it owed John Brown $1.3 million of the insurance proceeds.

█ Coastal argues that John Brown's claim to the insurance proceeds is an admission that John Brown had a property interest under the insurance policy, which John Brown could not have had if care, custody, and control had passed to Coastal prior to July 24, 1992, the date of the insurable event. Therefore, according to Coastal, John Brown's insurance claim is inconsistent with its position that substantial completion occurred on February 29, 1992.

Coastal misconstrues the nature of John Brown's claim with respect to the insurance proceeds. The property interest in the plant had shifted to Coastal after the turnover. Coastal was then the only named insured with standing to pursue the claim. John Brown, no longer having an insurable interest and unable to recover its costs directly from the insurance carrier, made an agreement with Coastal regarding the sharing of the insurance proceeds. Therefore, the jury's finding that substantial completion occurred on February 29, 1992, was not rendered immaterial by its finding that John Brown was entitled to

reimbursement from the insurance proceeds. Coastal's fourth issue is overruled.

█ In its fifth issue, Coastal asserts the jury's finding that the plant was substantially complete on February 29, 1992, is in fatal conflict with the jury's finding that John Brown was entitled to reimbursement from the insurance proceeds. Coastal waived any conflict in the jury's answer by failing to object to the alleged conflict before the jury was discharged. *See City of Port Isabel,* 976 S.W.2d at 860; *Torres,* 928 S.W.2d at 244; *Ciba–Geigy Corp.,* 871 S.W.2d at 324. In any event, even if Coastal had not waived this complaint for appellate review, John Brown's agreement with Coastal to share in the insurance proceeds is not inconsistent with John Brown having turned care, custody, and control of the plant over to Coastal on February 29, 1992. Coastal's fifth issue is overruled.

### D. Extra Work

In its sixth issue, Coastal claims there is no evidence to support the jury's finding that the removal of the defective boilers and installation of the new boilers constituted change or extra work. Coastal also contends the evidence established as a matter of law that such work was assigned work under the contract. In its seventh issue, Coastal asserts the jury's finding that the removal of the defective boilers and the installation of the new boilers qualified as change or extra work is rendered immaterial by evidence conclusively establishing that such work was part of the assigned work and did not qualify as change or extra work under the contract.

█ With respect to change or extra work, the contract provides that changes had to be approved by Coastal in writing. Coastal maintains that there is no evidence that John Brown complied with the contractual provisions governing changes or extra work with respect to the boilers. Specifically, Coastal did not sign off on the change order request for the boiler work.

However, Bill Godley, John Brown's project director, testified that all of the work represented by the change orders in connection with the boilers was performed at Coastal's request. He further testified that John Brown put Coastal on notice that it was change order work and that Coastal never objected to the boiler work being treated as change order work. We find there is more than a scintilla of evidence to support the jury's finding that the work John Brown performed in connection with the removal of the used boilers and the installation of the new boilers was change or extra work under the contract.

■ Moreover, the jury was specifically asked to determine whether the work John Brown performed in connection with the used and new boilers constituted extra work under the contract. The jury was not asked to determine whether John Brown had complied with any contractual provision requiring Coastal's written approval of change or extra work. Therefore, Coastal waived its complaint that John Brown failed to obtain Coastal's written approval by not raising this issue in the jury charge. *See* Tex.R.Civ.P. 274. Coastal's sixth and seventh issues are overruled.

### E. Quantum Meruit

In its eighth issue, Coastal contends the jury's finding that John Brown performed compensable work outside the scope of the contract in connection with the STAR unit is rendered immaterial by the jury's finding that John Brown was entitled to be reimbursed from the insurance proceeds. In its ninth issue, Coastal claims the trial court erred in awarding John Brown recovery for its work on the STAR unit under quantum meruit in light of the existence of an express agreement covering the disbursement of the insurance proceeds.

■ Quantum meruit is an equitable theory of recovery that is based on an implied agreement to pay for benefits received. *See Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992). To recover under quantum meruit, the claimant must establish that: (1) valuable services and/or materials were furnished, (2) to the party sought to be charged, (3) which were accepted by the party sought to be charged, and (4) under such circumstances as reasonably notified the recipient that the claimant, in performing, expected to be paid by the recipient. *See id.* It is well-established that a party may recover under quantum meruit *only* when there is no express contract covering the services or materials furnished. *See Vortt Exploration Co. v. Chevron U.S.A., Inc.*, 787 S.W.2d 942, 944 (Tex.1990); *Jackson v. Houston Indep. Sch. Dist.*, 994 S.W.2d 396, 401 (Tex.App.—Houston [14th Dist.] 1999, no pet.); *Economy Forms Corp. v. Williams Bros. Constr. Co.*, 754 S.W.2d 451, 458 (Tex.App.—Houston [14th Dist.] 1988, no writ). The existence of an express contract, however, does not preclude recovery in quantum meruit for the reasonable value of services rendered and accepted which are not covered by the contract. *See Black Lake Pipe Line Co. v. Union Constr. Co.*, 538 S.W.2d 80, 86 (Tex. 1976).

In its pretrial pleading, at the charge conference, and during closing argument, Coastal admitted that John Brown was entitled to $1.3 million of the insurance proceeds. Coastal explained to the jury how it calculated the $1.3 million figure. Coastal settled its lawsuit against the insurance carrier for 65 percent of the amount of the claim it had submitted. At the time Coastal submitted the claim to the carrier, John Brown claimed it had expended approximately $2 million in connection with the repairs to the STAR unit. Therefore, applying Coastal's 65 percent formula, John Brown would be entitled to only $1.3 million of the insurance proceeds.[2]

2. During its closing argument, John Brown

responded that it was entitled to $2,875,000

In response to Question No. 4, the jury found John Brown had performed compensable work in connection with the STAR unit outside the scope of the contract in the amount of $2,004,173. The jury was further asked in Question No. 5: "What amount of John Brown's costs did Coastal and John Brown, agree that John Brown would be reimbursed from *any* insurance proceeds received from the Builder's Risk insurance carriers?" (Emphasis added). The jury answered "$1.3 million." The trial court awarded John Brown the entire $2,004,713 under quantum meruit for its work performed outside the scope of the contract. Coastal contends the existence of the agreement concerning the arrangement to share the insurance proceeds precludes the recovery of the additional $704,173, i.e., the difference between $2,004,173 and $1.3 million, by John Brown under quantum meruit and, therefore, John Brown's recovery should be limited to $1.3 million. John Brown, on the other hand, contends that Coastal's admission of the existence of the agreement regarding the insurance proceeds does not preclude its recovery of the $704,173 shortfall under quantum meruit.

Here, there was no finding by the jury that the parties agreed that John Brown would look *solely* to the insurance proceeds for payment of its work on the STAR unit. Therefore, the $704,173 shortfall for the STAR unit work was not covered by the agreement that John Brown would be reimbursed $1.3 million from the insurance proceeds, as found by the jury, or by any other express agreement between John Brown and Coastal. This is demonstrated by the following exchange, which took place between the trial court and Coastal's counsel during the charge conference:

THE COURT: ... Coastal concedes, agrees, what-have-you that that there was an agreement between the parties that with the exception of any potential shortfall that John Brown would recover costs in connection with the STAR project out of the insurance proceeds received from the builders' [sic] risk insurance carriers, is that right?

MR. FOGLER: Subject only to the proviso that the parties did not agree as to any specific amount of John Brown's entitlement to recovery from the insurance proceeds but yes, that is correct.

Whether John Brown performed work outside the scope of the contract and the amount John Brown and Coastal had agreed that John Brown would receive from the insurance proceeds are entirely separate matters. Consequently, the agreement that John Brown was to recover a portion of the insurance proceeds does not preclude its recovery in quantum meruit for the $704,173 shortfall for the work performed in connection with the STAR unit. Coastal's eighth and ninth issues are overruled.

### F. Assigned Work

In its tenth issue, Coastal contends the evidence conclusively establishes that John Brown failed to perform the assigned work regarding the defective boilers, and that the jury's failure to find that John Brown did not perform the assigned work regarding the boilers is against the great weight and preponderance of the evidence.[3] In its eleventh issue, Coastal asserts the jury's failure to find that John Brown did not perform the assigned work regarding the boilers prior to substantial completion is rendered immaterial as a

---

of the insurance proceeds.

**3.** In its challenge to the factual sufficiency of the evidence, Coastal must show that the adverse finding is against the great weight and preponderance of the evidence. *See Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986) (per curiam). We examine the entire record, con-

sidering both the evidence in favor of, and contrary to, the challenged finding. *See id.* We will set aside the finding only if it is so against the great weight and preponderance of the evidence as to be manifestly unjust or erroneous. *See Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986).

matter of law under a proper legal construction of "assigned work" under the contract.

Coastal paid $3,076,421 to lease and purchase two new boilers after it was determined that the original boilers could not be used. Coastal contends that John Brown took the risk on all equipment necessary to a fully-operational plant, without an increase in the agreed lump-sum, fixed price. The used boilers, however, were subject to the Article 7.2 vendor warranty provision. Under this warranty, "[John Brown] assume[d] no responsibility or liability for any materials or equipment, whether new or used, furnished by OWNER for incorporation into the WORK." Instead, John Brown's liability for the vendor's work was limited to "using all reasonable efforts, short of litigation, to enforce third party warranties on behalf of OWNER." Relying on this warranty provision, Coastal asked John Brown to "take the lead in pursuing the warranties." Coastal does not claim that John Brown did not discharge its obligations to pursue the vendor's warranty on the boilers.

We find the evidence does not conclusively establish that John Brown failed to perform its assigned work with respect to the boilers; the jury's finding that John Brown did not fail to perform its assigned work is not against the great weight and preponderance of the evidence; and the jury's failure to find that John Brown did not perform the assigned work regarding the boilers prior to substantial completion is not rendered immaterial. Coastal's tenth and eleventh issues are overruled.

Having overruled each of Coastal's issues, we, accordingly, affirm the judgment of the trial court.