The Estate of George PUCKETT d/b/a Puckett Auto Sales, Appellant,

v.

Juana Lorena ARVIZU, Individually and a/n/f of Jonathan Rene Arvizu, Montgomery County Auto Auction, Edward Cantu and Allstate Insurance Company, Appellees.

No. 09–09–00453–CV.

Court of Appeals of Texas, Beaumont.

Nov. 10, 2010.

Levon G. Hovnatanian, Bruce E. Ramage, Kevin Cain, Martin, Disiere, Jefferson & Wisdom, L.L.P., Philip A. Werner, Michelle Le, Werner Ayers, L.L.P., Houston, for appellant.

Toni M. Triplett, Triplett Law Firm, Jack McKinley, Ramey, Chandler, McKin-

ley & Zito, P.C., Houston, Thomas E. Quirk, Law Offices of Aaron & Quirk, San Antonio, for Appellees.

Before McKEITHEN, C.J., KREGER and HORTON, JJ.

## MEMORANDUM OPINION

STEVE McKEITHEN, Chief Justice.

Appellee Juana Lorena Arvizu, individually and as next friend of Jonathan Rene Arvizu ("Arvizu"), sued appellees Montgomery County Auto Auction ("MCAA") and Edward Cantu, as well as appellant The Estate of George Puckett d/b/a Puckett Auto Sales ("Puckett"),[1] for personal injuries sustained when her vehicle was struck by a vehicle owned by Puckett and driven by Cantu.[2] Arvizu contended that Cantu was operating the vehicle for George's benefit, and that Cantu was "acting within the course and scope of his employment for defendant [MCAA], and was about his employer's business and affairs." The jury found that Cantu was an employee of MCAA, but was on a mission for George's benefit and was subject to control by George as to the details of the work. In three issues, The Estate of George Puckett d/b/a Puckett Auto Sales argues that the jury's answers to questions in the charge fatally conflict. We reverse the trial court's judgment solely as to The Estate of George Puckett d/b/a Puckett Auto Sales and remand the cause for further proceedings consistent with this opinion.

## The Evidence

George Puckett ("George") testified by deposition that he was self-employed as the owner of Puckett Auto Sales, a wholesale used car business.[3] George explained that his business sells automobiles to dealers or in auctions. George testified that he sells cars at MCAA every Monday. George testified that most of the time, MCAA picked up cars from him, and he explained that he would "tell [MCAA] what I want for [a vehicle]. They either get that, or they get something real close. And I want to sell it, I sell it. If not, I just don't sell it." According to George, he always had cars that did not sell, and he could leave the vehicles with MCAA for the following week's sale, or MCAA would deliver them to George if he believed he could sell them himself. George testified that MCAA would also deliver unsold vehicles to the ADESA auction for him. George testified that he sometimes called MCAA and asked MCAA to move a vehicle for him.

George explained that he does not have a written agreement with MCAA. George stated that he owned the vehicle that was involved in the accident with Arvizu. MCAA picked up the vehicle and transported it to MCAA's lot to sell it, but the vehicle did not sell that evening, so he instructed MCAA to deliver the vehicle to the ADESA auction. George testified that he expected one of MCAA's drivers to drive the vehicle to the ADESA lot, which was thirty to forty miles from MCAA's lot. George explained that he has never requested information from MCAA concerning MCAA's drivers. George testified that he believed he had seen Cantu before, and that Cantu was "a driver from [MCAA]." George also testified that when MCAA transported his unsold cars to the ADESA auction, he left it to MCAA to entrust the

---

**1.** Appellee Allstate Insurance Company intervened in the lawsuit and asserted a claim for benefits paid as a result of the accident.

**2.** The parties stipulated that Cantu's negligence proximately caused the accident.

**3.** George Puckett died prior to trial.

vehicles to competent drivers, and he had nothing to do with who MCAA chose to hire as drivers. George explained he did not know who was driving the vehicle that struck Arvizu until he received notification that the accident had occurred.

George learned of the accident when an employee of MCAA informed him that it had occurred. George testified that when the accident occurred, MCAA was transporting the vehicle for George's business purposes, and that MCAA had his permission to have one of MCAA's drivers drive the vehicle to the ADESA auction. George testified that he never rejected particular MCAA drivers, and when asked whether he could have told MCAA who he wanted to drive the car, he responded, "I guess I could have." When asked whether he could have instructed MCAA not to use a particular driver to drive his cars, George responded, "... I was not familiar with very many of them."

Buddy Cheney, the general manager of America's Auto Auction, which was formerly known as MCAA, testified that George did business with MCAA on a weekly basis. Cheney characterized Puckett Auto Sales as a "high volume dealer." According to Cheney, Cantu was employed with MCAA as a driver when the accident occurred. Cheney explained that MCAA did not receive compensation for picking up vehicles and bringing them to the auction because doing so was part of MCAA's customer service and was a known benefit throughout the industry. When asked how drivers were assigned to pick up vehicles, Cheney replied, "There's no specific designation. Mr. Puckett would call and say I have 20 vehicles. And we would send a van with drivers, not 20 drivers. If we had to make two trips or three trips, we would just recycle those drivers...."

According to Cheney, when MCAA needed drivers, MCAA would place an ad in the newspaper, interview potential drivers, and hire them. Cheney explained that to serve as a driver for MCAA, a person had to be over twenty-one years of age, have a valid driver's license, and have a good driving record. The requirements to serve as a driver were dictated by MCAA's insurance company. Cheney testified that George occasionally requested the assistance of MCAA's drivers to pick up vehicles. Cheney also testified that George did not request information concerning the qualifications of MCAA's drivers, nor did George ask for the names of the individuals who would be driving his vehicles or request that any particular driver not handle one of his vehicles. In addition, Cheney explained that when the accident occurred, George had not given instructions to MCAA about what route he wanted MCAA to take in transporting his vehicles to the ADESA auction. Cheney also testified that George never asked for information about the route MCAA's drivers would use to take his vehicles from MCAA to the ADESA auction. Cheney testified that he learned of the accident involving Cantu and Arvizu when he received a call from MCAA, and Cheney went to the accident scene and spoke to Cantu. According to Cheney, MCAA's assistant manager, general manager, and some of the other drivers also came to the accident scene. Cheney testified that someone from MCAA notified George of the accident.

Cheney explained that Cantu was driving the vehicle when the accident occurred, and that Cantu was driving the vehicle as part of his employment with MCAA. Cheney testified that Cantu regularly transported vehicles as part of his job duties with MCAA. Cheney explained that upon receiving instructions from George to move Puckett's vehicles, MCAA assembled its drivers and assigned vehicles to them randomly unless "somebody c[ould]n't

drive a standard transmission." George instructed MCAA to move the vehicle in question to the ADESA auction, and an MCAA employee gave Cantu the keys to the vehicle and instructed Cantu to move the vehicle from MCAA to the ADESA auction.

Cheney testified that George did not assign Cantu to the vehicle in question. According to Cheney, if George had told MCAA not to use Cantu as a driver for Puckett Auto Sales's vehicles, MCAA would have done as Puckett requested. Cheney also testified that the route Cantu took was "just the common sense route to take. It's the shortest, quickest means to get there." Cheney explained that if George had requested that the driver take a particular route, MCAA would have accommodated the request, but that George had never made such a request. Cheney testified that George did not have the right to fire Cantu or to reprimand Cantu, and that when the accident occurred, George had no control over Cantu's actions. According to Cheney, with respect to the speed, route, fuel needs, and other details of the trip, more than one person might have had control, but all of the individuals who had such control were MCAA employees.

George's widow, Linda, testified that she began working with George in the car business in 1990. Linda explained that her husband did most of his business with dealers such as MCAA rather than with retail customers. When asked how MCAA was compensated if her husband wanted to sell vehicles through MCAA, Linda testified, "Well, from us, they get a seller's fee. And if [Puckett] sold the car, they also got a buyer's fee. So, that's where they made their money." Linda testified that when George needed cars to be transported to the auction, she would telephone MCAA and tell them how many cars needed to be picked up, and MCAA "went from there." Linda explained that George sometimes asked MCAA to transport vehicles to other facilities, but he did not dictate who was to drive the car, did not select the route, and did not dictate the time that the cars were to be moved. When asked whether she could think of any detail concerning the trip from MCAA to the ADESA auction, Linda testified that George did not dictate any terms to MCAA other than the destination of the vehicles. According to Linda, no written agreements existed between MCAA and George. Linda explained that she did not know Cantu personally, but she recognized his name. Linda opined that because Cantu was MCAA's employee, George was not responsible for the accident and the resulting damages.

At the conclusion of the evidence, the trial court conducted a charge conference. During the charge conference, Puckett's counsel lodged the following objections:

I would also point out to the Court . . . that the submission of Question 2 with Question 1 raises the potential conflict which we could get inconsistent answers. [sic] . . . And furthermore, in the context of this case, in the event of inconsistent answers in Question No. 1 and No. 3, it would create a complete conflict and would probably require a new trial in this case.

The trial court overruled the objections. The jury charge was as follows, in pertinent part:

### QUESTION NO. 1

On the occasion in question, was Edward Cantu acting as an employee of Montgomery County Auto Auction or George Puckett d/b/a Puckett Auto Sales?

An "employee" is a person in the service of another with the understanding, express or implied, that such other person has the right to direct the details of

the work and not merely the result to be accomplished.

An employee ceases to be the employee of his general employer if he becomes the "borrowed employee" of another. One who would otherwise be in the general employment of one employer is a borrowed employee of another employer if such other employer or his agents have the right to direct and control the details of the particular work inquired about.

For purposes of this question, the term "employee" includes "borrowed employee." On the occasion in question, Edward Cantu could not have been an employee of both Montgomery County Auto Auction and George Puckett d/b/a Puckett Auto Sales.

Answer "Montgomery County Auto Auction" or "George Puckett d/b/a Puckett Auto Sales."

Answer: *Montgomery County Auto Auction*

### QUESTION NO. 2

On the occasion in question, was Edward Cantu transporting the vehicle in the furtherance of a mission for the benefit of George Pucket[t] D/B/A Puckett Auto Sales and subject to control by George Pucket[t] D/B/A Puckett Auto Sales as to the details of the mission?

Answer "Yes" or "No."

Answer: *Yes*

### QUESTION NO. 3

On the occasion in question, was Montgomery County Auto Auction transporting the vehicle in the furtherance of a mission for the benefit of George Pucket[t] D/B/A

Puckett Auto Sales and subject to control by George Pucket[t] D/B/A Puckett Auto Sales as to the details of the mission?

Answer "Yes" or "No."

Answer: *Yes*

When the jury's verdict was read, Puckett's counsel lodged the following objection: "I would object to the acceptance of the verdict because of the internal conflict between the answers to [questions] 1, 2[,] and 3. . . . There is a conflict because the key issue is control. And there's no way that we can square the answer to issue No. 1 with the answer to issue No. 2 and 3, as I objected to the proposal of this charge." The trial court overruled the objection, accepted the verdict, and signed a judgment in favor of Arvizu against MCAA, Puckett, and Cantu, jointly and severally.[4] Puckett raises three issues in this appeal: (1) the jury's answers to question two and question one are in fatal conflict, (2) the jury's answers to question one and question three are in fatal conflict, and (3) the judgment must be reversed as to Puckett because the judgment is predicated upon conflicting findings.

### Pertinent Law

■ In reconciling jury findings, appellate courts apply a de novo standard of review. *Adams v. Allstate County Mut. Ins. Co.,* 199 S.W.3d 509, 512 (Tex.App.-Houston [1st Dist.2006, pet. denied). Appellate courts must attempt to interpret jury findings so as to uphold the trial court's judgment. *Rice Food Mkts., Inc. v. Ramirez,* 59 S.W.3d 726, 733–34 (Tex. App.-Amarillo 2001, no pet.) (citing *First Fed. Sav. & Loan Ass'n of Dallas v. Sharp,* 359 S.W.2d 902, 903 (Tex.1962)). The threshold issue is whether the jury's

---

4.  MCAA does not contest the judgment on appeal, but instead argues that the jury's answers are reconcilable. In its judgment, the trial court ordered that George would recover nothing from MCAA for his cross-claim for property damage, and that MCAA had "full rights" of contribution against George.

findings are about the same material fact. *Bender v. Southern Pac. Transp. Co.*, 600 S.W.2d 257, 260 (Tex.1980). Conflicting jury findings do not prevent rendition of judgment by the trial court unless the findings, considered separately and taken as true, would compel the rendition of different judgments. *Waltrip v. Bilbon Corp.*, 38 S.W.3d 873, 877 (Tex.App.-Beaumont 2001, pet. denied).

> The apparent[ly] conflicting answers must be such that one answer would establish a cause of action or defense while the other would destroy it. The test is whether taking the finding alone in the one instance, a judgment should be entered in favor of the plaintiff; and taking it alone in the other, a judgment should be entered in favor of the defendant. To apply this test, the courts consider each of the answers claimed to be in conflict, disregarding the alleged conflicting answer, but taking into consideration all the rest of the verdict, and if, so considered, one of the answers would require a judgment in favor of the plaintiff and the other would require a judgment in favor of the defendant, then the answers are fatally in conflict.

*Compton v. Polonski*, 567 S.W.2d 835, 838 (Tex.Civ.App.-Corpus Christi 1978, no writ); *see Waltrip*, 38 S.W.3d at 877; *see also Coastal Chem., Inc. v. Brown*, 35 S.W.3d 90, 99 (Tex.App.-Houston [14th Dist.] 2000, pet. denied).

■ A court must reconcile conflicting jury findings if at all possible "in light of the pleadings and evidence, the manner of submission, and the other findings considered as a whole." *Waltrip*, 38 S.W.3d at 878; *see also Huber v. Ryan*, 627 S.W.2d 145, 145–46 (Tex.1981). In addition, courts must presume that jurors do not intend to return conflicting answers, and must not strike down the jury's answers if there is any reasonable basis upon which to reconcile them. *Waltrip*, 38 S.W.3d at 878; *see also Adams*, 199 S.W.3d at 512. If the jury's findings concern the same material fact and there is no reasonable basis upon which the findings can be reconciled, the findings are in fatal conflict. *Bender*, 600 S.W.2d at 260. Findings that fatally conflict destroy each other and leave no findings on the issues involved, at least to the extent of the conflict. *Fidelity & Cas. Co. of New York v. McLaughlin*, 134 Tex. 613, 135 S.W.2d 955, 958 (1940). Generally, "[f]atal conflicts require a new trial." *Calabrian Chems. Corp. v. Bailey–Buchanan Masonry, Inc.*, 44 S.W.3d 276, 282 (Tex.App.-Beaumont 2001, pet. denied).

Application of the Law to the Facts

■ In question one, the trial court instructed the jury that an "employee" was "a person in the service of another with the understanding, express or implied, that such other person has the right to direct the details of the work and not merely the result to be accomplished." The trial court also instructed the jury that an employee could become the borrowed employee of another employer "if such other employer or his agents have the right to direct and control the details of the particular work inquired about[,]" and that the term "employee" includes "borrowed employee." Finally, the trial court instructed the jury that Cantu could not have been an employee of both MCAA and George, and asked the jury to determine whether Cantu was acting as an employee of MCAA or George on the occasion in question. The jury responded that Cantu was MCAA's employee. In question two, the trial court asked the jury whether Cantu was transporting the vehicle in furtherance of a mission for the benefit of George and "subject to control" by George "as to the details of the mission[,]" and the jury responded, "Yes."

At the outset, we must determine whether questions one and two concern the same material fact. *See Bender*, 600 S.W.2d at 260. The definition of "direct" is, among other things, "to regulate the activities or course of . . . to guide and supervise[;] to request or enjoin esp. with authority[.]" *Webster's Third New International Dictionary* 640 (2002). "Control" is defined, *inter alia*, as "the act or fact of controlling . . . power or authority to guide or manage: *directing* or restraining domination[.]" *Id.* at 496 (emphasis added). Therefore, for purposes of our analysis, we conclude that, as used in question one and the accompanying instructions and in question two, the terms "direct" and "control" are synonymous. "Mission" is defined as "a specific task with which a person or group is charged; *esp.* . . . an assignment given to a person or group in an official capacity[;] . . . a continuing task or responsibility that one is destined or fitted to do or specially called upon to undertake: LIFEWORK, VOCATION[.]" *Id.* at 1445. "Work" is defined as "the labor, task, or duty that affords one his accustomed means of livelihood[;] . . . a specific task, duty, function, or assignment often being a part or phase of some larger activity[.]" *Id.* at 2634. We find that the terms "work" and "mission" as used in questions one and two are synonymous. Both questions turn upon the issue of whether MCAA or George had the right to control Cantu's work. Accordingly, we conclude that questions one and two concern the same material fact.

The trial court's instructions with question one informed the jury that a person is an employee of another if the employer "has the right to direct the details of the work and not merely the result to be ac-

complished[,]" and also told the jury that Cantu could not have been the employee of both MCAA and George when the accident occurred. In addition, the trial court's instructions informed the jury that a person is a borrowed employee of another if the other employer has "the right to direct and control the details of the particular work[.]" In response, the jury determined that MCAA was Cantu's employer, which, as defined in the trial court's instructions, meant that the jury had determined that MCAA had the right to direct the details of Cantu's work. In question two, the trial court asked the jury whether Cantu was on a mission for George's benefit "and subject to control by [George] as to the details of the mission[,]" and in response, the jury answered "Yes." Both MCAA and George could not have had the right to direct the details of Cantu's work; indeed, the court's charge to the jury indicated that Cantu could have been the employee of either MCAA or George, not both, so the jury's affirmative response to question one necessarily indicates that the jury found that MCAA had the right to control the details of Cantu's work. *See Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 862 (Tex.2009) ("The jury is presumed to have followed the court's instructions.").

As previously discussed, vicarious liability was the means by which Arvizu sought to impose liability for Cantu's negligence upon both MCAA and George. Specifically, Arvizu contended that MCAA was "liable for the negligent acts of omission and commission of its agent and/or employee[,] EDWARD CANTU, under the theory of respondeat superior and/or vicarious liability[,]" [5] and that George was "liable for the negligent acts of omission and commission of its authorized driver EDWARD CAN-

---

5. *Respondeat superior* is a particular type of vicarious liability. *See Vecellio Ins. Agency, Inc. v. Vanguard Underwriters Ins. Co.*, 127 S.W.3d 134, 138 (Tex.App.-Houston [1st Dist.] 2003, no pet.) (op. on reh'g).

TU." In determining whether questions one and two are in fatal conflict, we consider the findings separately, take each as true, and determine whether the findings would compel the rendition of different judgments. *See Waltrip*, 38 S.W.3d at 877.

When we take as true the jury's response to question one and disregard the answer to question two, the jury's finding as to question one would result in a judgment that MCAA was vicariously liable for Cantu's negligence because MCAA had the right to direct Cantu's work. *See generally Waltrip*, 38 S.W.3d at 877; *Compton*, 567 S.W.2d at 838. When we take as true the jury's answer to question two and disregard the answer to question one, the jury's finding as to question two would result in a judgment that George was vicariously liable for Cantu's negligence because George had the right to direct Cantu's work. *See generally id.* Therefore, because questions one and two concern the same material fact and cannot reasonably be reconciled, they are in fatal conflict. *See Bender*, 600 S.W.2d at 260. Accordingly, we sustain issues one and three. Since questions one and two are the only questions that pertain to the alleged vicarious liability of George and MCAA for Cantu's negligence, we need not reach Puckett's third issue, which asserts that the jury's response to question three (in which the jury found that George had the right to direct the details of MCAA's work) fatally conflicts with its answer to question one. We reverse the trial court's judgment as to The Estate of George Puckett d/b/a Puckett Auto Sales and remand the cause for further proceedings consistent with this opinion.

REVERSED AND REMANDED.